**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CRYSTAL PELAYO, JACOB TINGLE, ISAIAH ESQUIBEL, GINO GADALETA, BRICE GAMBILL, RALEIGH MELANCON, and MICAH PARKER, individually and on behalf of others similarly situated, | INDEX NO.   1:25-cv-9913 |

CRYSTAL PELAYO, JACOB TINGLE,
ISAIAH ESQUIBEL, GINO GADALETA,
BRICE GAMBILL, RALEIGH
MELANCON, and MICAH PARKER,
individually and on behalf of others similarly
situated,

                 Plaintiffs,

                 -against-

KALSHI INC.;KALSHIEX LLC; KALSHI
KLEAR INC.; KALSHI KLEAR LLC; and
KALSHI TRADING LLC,

                 Defendants.

INDEX NO.   1:25-cv-9913

**COMPLAINT—CLASS ACTION**


**JURY DEMAND**

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................................... 1

PARTIES ............................................................................................................................... 5

JURISDICTION AND VENUE ............................................................................................ 8

FACTUAL ALLEGATIONS ................................................................................................ 8

    I.     The Prediction Market Industry ..................................................................... 8

    II.    Kalshi's product is unlawful sports betting. ................................................ 13

    III.   Kalshi dupes consumers into thinking they are legally gambling against
           other consumers, when they are actually gambling against the House ............... 17

    IV.   Illegal gambling is addictive and dangerous, especially when consumers
           do not have proper safeguards. ...................................................................... 22

    V.    States are Cracking Down on Unlawful Sports Betting .................................... 26

CLASS ALLEGATIONS ...................................................................................................... 27

CLAIMS FOR RELIEF ....................................................................................................... 33

    I.     CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE CLASS .......... 33

    II.    STATE SPECIFIC CLAIMS ........................................................................ 37

PRAYER FOR RELIEF ....................................................................................................... 41

JURY DEMAND ................................................................................................................... 42

3356326.6

1.      Plaintiffs Crystal Pelayo, Jacob Tingle, Isaiah Esquibel, Gino Gadaleta, Brice Gambill, Raleigh Melancon, and Micah Parker bring this action, individually and on behalf of all others similarly situated, against KalshiEx LLC, Kalshi Inc., Kalshi Klear LLC, Kalshi Klear Inc., and Kalshi Trading LLC (collectively "Kalshi" or "Defendant") to recover wagers from Defendant's illegal sports gambling operation. Plaintiffs allege the following upon personal knowledge as to themselves and their own acts and experiences, and upon information and belief, including investigations conducted by their attorneys, as to all other matters.

## NATURE OF THE ACTION

2.      Defendant Kalshi owns and operates an online and app-based platform that it markets as a "prediction market." In actuality, however, Kalshi operates an unlicensed sports gambling platform, which is accessible to any resident of the United States who is over the age of 18.[1] By operating unlicensed sports betting, Defendant has violated gambling laws, engaged in illegal deceptive activity, and unjustly enriched itself at the expense of millions of consumers. Accordingly, Plaintiffs, on behalf of themselves and a Class of similarly situated individuals, bring this lawsuit to recover their wagers, as well as costs and attorneys' fees.

3.      Since January 2025, Kalshi has been classifying online sports bets on its platform as "event contracts," including in states where online sports betting is categorically illegal.[2] Accordingly, consumers place bets on Kalshi on the outcome of sports games, individual player metrics, team results, and or a combination (parlays). These bets do not differ materially from bets available at casinos or sportsbooks. Indeed, Kalshi markets its product as betting on sports.

---

[1] Marc Novicoff, *The Company Making a Mockery of State Gambling Bans,* The Atlantic (Oct. 26, 2025), https://www.theatlantic.com/ideas/archive/2025/10/sports-betting-kalshi-cftc/684689/.
[2] Ben Blatt and Amy Fan, *Is Sports Betting Illegal in Your State? Not if You Call It a 'Prediction Market.'* NY Times (Oct. 5, 2025), https://www.nytimes.com/2025/10/05/upshot/sports-betting-prediction-markets.html.

For example, it markets its site to consumers as an opportunity (with devil horns) to "Bet on the NFL," claiming that it is "Legal in 50 states."[3]



4.      Kalshi's illegal online sportsbook has become its primary source of revenue. In September 2025, 90% of Kalshi's volume of bets placed was from sports betting, with U.S.

---

[3] Kalshi has been running these type of ads since February 2025. *See* Dustin Gouker, *Kalshi Is Advertising That 'Sports Betting' Is Legal In California, Texas*, Event Horizon (Sep. 17, 2025), https://nexteventhorizon.substack.com/p/kalshi-is-advertising-sports-betting-legal-in-california-texas; Marc Novicoff, *The Company Making a Mockery of State Gambling Bans*, *supra* note 1.

consumers placing more than $2 billion in sports bets.[4] In October 2025, Kalshi closed a $300 million funding round, with a valuation of $5 billion.[5] In November 2025, Kalshi raised $1 billion round at a $11 billion valuation, which continues to grow.[6]

5.    In New York, where Kalshi is headquartered, operating a sports betting platform is illegal without a license, and Kalshi does not have one. Licensing plays an important role in sports betting because sports betting is a form of gambling, a highly addictive behavior. Licenses allow the state to maintain gaming integrity, regulate who wagers money (including restricting minors and compulsive gamblers), and prevent unfair or misleading advertising. Without such oversight, sportsbooks are able to mislead the public, including duping consumers into thinking they are not engaging in the highly addictive behavior of gambling when they are, creating betting lines with extremely poor odds of winning, misrepresenting consumers' chances of winning, and ultimately collecting money from consumers who do not realize the implications of their bets.

6.    The New York State Gaming Commission has come to the same conclusion. On October 24, 2025, it sent Kalshi a letter informing Kalshi that Kalshi was operating an unlicensed mobile betting platform in violation of New York law.[7] Accordingly, it demanded that Kalshi "cease and desist immediately from illegally operating, advertising, promoting,

---

[4] Lev Akabas, *Kalshi's Volume Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025), https://www.sportico.com/business/sports-betting/2025/kalshi-nfl-football-trade-bet-volume-1234872696/

[5] Anthony Clarke, *Kalshi Pulls in $300M and Rockets to a $5B Valuation*, Yahoo Finance (Oct. 10, 2025), https://finance.yahoo.com/news/kalshi-pulls-300m-rockets-5b-213923258.html.

[6] Marina Temkin, *Source: Kalshi's valuation jumps to $11B after raising massive $1B round*, TechCrunch (Nov. 20, 2025), https://techcrunch.com/2025/11/20/source-kalshis-valuation-jumps-to-11b-after-raising-massive-1b-round/.

[7] *New York Slaps Kalshi With Cease-and-Desist Order*, Bookmakers Review (Oct. 30, 2025), https://www.bookmakersreview.com/industry/new-york-kalshi/

administering, managing or otherwise making available sports wagering and/or a mobile sports wagering platform in New York[.]"[8] However, Kalshi continues to operate its illegal sports betting platform out of its New York headquarters to residents of all states.

7.     Other state regulators agree with the New York State Gaming Commission. State Attorneys General and gaming commissions in Arizona, Illinois, Maryland, Montana, Nevada, New Jersey, and Ohio have also sent letters ordering Kalshi to cease and desist offering illegal sports betting under the guise of prediction markets. The Massachusetts Attorney General similarly concluded Kalshi's "event contracts" are illegal sports betting, and brought a lawsuit.[9]

8.     The National Council on Problem Gambling, a non-profit that seeks to minimize the economic and social costs associated with gambling addiction, also wrote a letter raising concerns that prediction markets such as Kalshi could lead to harms for problem gamblers because of insufficient age restrictions, betting limits, or other safeguards for sports betting. The Council stated that "[f]rom a problem gambling standpoint, betting on futures is functionally gambling."[10]

9.     Even Kalshi's own lawyers have argued that laws regulating prediction markets do not cover sports betting. A January 2024 Kalshi brief acknowledged that regulators did not want event contracts to "launder casino-style or sports gambling through the derivatives markets."[11] According to Kalshi, "gaming" referred to contracts contingent on games—for

---

[8] *Id.*

[9] *AG Campbell Sues Online Prediction Market for Illegal and Unsafe Sports Wagering Operations*, Office of the Attorney General, https://www.mass.gov/news/ag-campbell-sues-online-prediction-market-for-illegal-and-unsafe-sports-wagering-operations.

[10] National Council on Problem Gambling, *Re: Prediction Markets Roundtable*, March 10, 2025, https://www.cftc.gov/media/11956/NationalCouncilonProblemGambling031025/download

[11] *KalshiEX LLC v. Commodity Futures Trading Commission*. Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, 1:23-cv-03257-JMC, Dkt. 17-1 at 16, (D.D.C. Jan. 25, 2024).

example, "whether a certain team will win the Super Bowl."[12] In November 2024, Kalshi again

stated in a filing that a wager is gambling "if it is contingent on a game or a game-related

event."[13] The filing explained: "The classic example is a contract on the outcome of a sporting

event; as the legislative history directly confirms, Congress did not want sports betting to be

conducted on derivatives markets."[14]

10.     But months after publicly stating that sports betting is gambling, Kalshi has made

the business decision to offer bets on which team would win the Super Bowl without obtaining a

sports betting license.

11.     By operating unlicensed sports betting, Kalshi has violated gambling laws,

engaged in illegal deceptive activity, and unjustly enriched itself at the expense of tens of

thousands of consumers. Accordingly, Plaintiffs on behalf of themselves and a Class of similarly

situated individuals, bring this lawsuit to recover their wagers, as well as costs and attorneys'

fees.

**PARTIES**

12.     Crystal Pelayo is a natural person and a citizen of the state of California. She

signed up through the Kalshi App in California in 2023. Ms. Pelayo was not informed by Kalshi

of the nature of its games – that it operates an unlicensed sportsbook – when she wagered and

lost money on the Kalshi App.

13.     Jacob Tingle is a natural person and a citizen of the state of Florida. He signed up

through the Kalshi App in Florida in October 2025. Mr. Tingle was not informed by Kalshi of

the nature of its games – that it operates an unlicensed sportsbook – when he wagered and lost

---

[12] *Id.*

[13] *KalshiEX LLC*, Plaintiff-Appellee, v. *Commodity Futures Trading Commission*, Defendant-Appellant, No. 23-cv-03257-JMC, Brief of KalshiEx LLC (D.C. Cir. Nov. 15, 2024).
[14] *Id.*

money on the Kalshi App.

14.    Isaiah Esquibel is a natural person and a citizen of the state of New Mexico. He signed up through the Kalshi App in New Mexico in October 2025. Mr. Esquibel was not informed by Kalshi of the nature of its games – that it operates an unlicensed sportsbook – when he wagered and lost money on the Kalshi App.

15.    Gino Gadaleta is a natural person and a citizen of the state of New York. He signed up through the Kalshi App in New York in October 2024. Mr. Gadaleta was not informed by Kalshi of the nature of its games – that it operates an unlicensed sportsbook – when he wagered and lost money on the Kalshi App.

16.    Brice Gambill is a natural person and a citizen of the state of New York. He signed up through the Kalshi App in New York in November 2025. Mr. Gambill was not informed by Kalshi of the nature of its games – that it operates an unlicensed sportsbook – when he placed a wager on the Kalshi App.

17.    Raleigh Melancon is a natural person and a citizen of the state of Texas. He signed up through the Kalshi App in Texas in 2025. Mr. Melancon was not informed by Kalshi of the nature of its games – that it operates an unlicensed sportsbook – when he wagered and lost money on the Kalshi App.

18.    Micah Parker is a natural person and a citizen of the state of Arizona. He signed up through the Kalshi App in Arizona in approximately October 2025. Mr. Parker was not informed by Kalshi of the nature of its games – that it operates an unlicensed sportsbook – when he wagered and lost money on the Kalshi App.

19.    Defendant Kalshi Inc. is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. Upon information and belief, it is the parent

company of all other Kalshi entities (collectively "Kalshi"). Kalshi operates a "prediction market," allowing consumers to place illegal, unregulated wagers. Upon information and belief, Kalshi operates its business primarily through its headquarters in New York, processes payments in New York, and designates New York as the governing law in its terms of use.

20.    Defendant KalshiEX LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. Upon information and belief, it is a wholly owned subsidiary of Kalshi Inc. Together with the other Kalshi entities, Kalshi operates a "prediction market," allowing consumers to place illegal, unregulated wagers. Upon information and belief, Kalshi operates its business primarily through its headquarters in New York, processes payments in New York, and designates New York as the governing law in its terms of use.

21.    Defendant Kalshi Klear Inc. is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. Upon information and belief, it is a wholly owned subsidiary of Kalshi Inc. Together with the other Kalshi entities, Kalshi operates a "prediction market," allowing consumers to place illegal, unregulated wagers. Upon information and belief, Kalshi operates its business primarily through its headquarters in New York, processes payments in New York, and designates New York as the governing law in its terms of use.

22.    Defendant Kalshi Klear LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. Upon information and belief, it is a wholly owned subsidiary of Kalshi Inc. Together with the other Kalshi entities, Kalshi operates a "prediction market," allowing consumers to place illegal, unregulated wagers. Upon information and belief, Kalshi operates its business primarily through its headquarters in New York,

processes payments in New York, and designates New York as the governing law in its terms of use.

23.    Defendant Kalshi Trading LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. In concert with other Kalshi entities, it operates a prediction market, allowing the State's residents to place illegal, unregulated wagers. Kalshi Trading LLC operates as a market maker for Kalshi's prediction market, buying and selling "event contracts" on the platform. Upon information and belief, Kalshi Trading LLC directly coordinates with Kalshi Inc. to provide liquidity for its markets. Upon information and belief, Kalshi operates its business primarily through its headquarters in New York, processes payments in New York, and designates New York as the governing law in its terms of use.

## JURISDICTION AND VENUE

24.    Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

25.    The Court has personal jurisdiction over Defendant because the wrongful conduct by Defendant occurred in and emanated from this District.

26.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District.

## FACTUAL ALLEGATIONS

### I.    The Prediction Market Industry

27.    A "prediction market" allows for the purchase and sale of "event contracts." Event contracts are "agreements, contracts, transactions, or swaps in excluded commodities that

are based upon the occurrence, extent of an occurrence, or contingency," "other than a change in the price, rate, value, or levels of a commodity." 7 U.S.C. § 7a-2(c)(5)(C)(i). In other words, event contracts pay out if a future event does (or does not) occur.

28.    Defendant Kalshi is a private technology company founded in 2018 by Tarek Mansour and Luana Lopes Lara. Kalshi operates both a website and mobile application out of its New York headquarters. Kalshi claims to operate a prediction market for event contracts.

29.    When Kalshi began offering markets in June 2021, it offered binary yes-or-no contracts about whether an event would occur, such as "will a recession start by the second quarter of 2022" or "will income taxes on the highest income bracket increase by the end of 2021."[15] Consumers could buy either "Yes" or "No" at some variable price ranging from $0.01 to $0.99. Back then, Kalshi distinguished itself from casinos by arguing "the economic usefulness of hedging outcomes and market pricing are two elements that make Kalshi different from a casino."[16] It also asserted that it only made its money from a "transaction fee," rather than casinos where "the revenue they make is out of their customer's losses."[17]

30.    But Kalshi has changed its tune. In 2024, Kalshi started offering political election contracts, allowing consumers to bet on which candidate would win the 2024 presidential election, or which party would control Congress.[18] Election betting drew significantly more consumers to Kalshi. In October 2024, consumers bet more than $100 million on Kalshi's

---

[15] *See* Jesse Pound, "This new exchange lets investors vote yes or no on major events to hedge their portfolios," CNBC (Dec. 29, 2021), https://www.cnbc.com/2021/12/29/this-new-exchange-lets-investors-vote-yes-or-no-on-major-events-to-hedge-their-portfolios.html.

[16] *Id.*

[17] *Id.*

[18] *See* Tarek Mansour, "It's official: You can now trade on the U.S. Presidential Election," Kalshi (Oct. 4, 2024), https://news.kalshi.com/p/official-kalshi-makes-history-with-100-legal-election-trading.

election markets.[19] Monsour stated: "It's actually the best mechanism to get more truth about

who's actually going to win. We're letting the market speak instead of pundits, pollsters, people,

political figures, people with biases or conflicts of interest, people that had incentives or not."[20]

31.     Then in January 2025, Kalshi got greedy and fundamentally changed its business

model. Kalshi began to offer illegal sports betting falsely styled as event contracts.[21] Mansour

posted, "Today, on the heels of our explosive growth, Kalshi takes its next big step: **Sports**.

Legal sports markets, accessible to Americans in all 50 states."



---

[19] *See* Lydia Moynihan, *Kalshi's daring bet on election betting is paying off — to the tune of $100 million*, NY Post (Oct. 31, 2024), https://nypost.com/2024/10/31/business/kalshis-daring-bet-on-election-betting-is-paying-off./
[20] *Id.*
[21] *See* Justin Byers, "Prediction market Kalshi expands reach with sports event contracts," SBC Americas (Jan. 23, 2025), https://sbcamericas.com/2025/01/23/kalshi-expands-sports-event-contracts/.

32.    Kalshi's official account also posted. It stated there would be "sports trading" in all 50 states. It also marketed its products as having "no house," and "Live trading during the game[.]"



33.    By May 2025, more than 75% of Kalshi's volume came from sports betting, and public reports indicated Kalshi made a larger percentage of its money from sports than certain licensed sports betting companies.[22]

34.    By September 2025, Kalshi expanded still further into illegal sports gambling. It began offering categories that mirror traditional sports betting, including bets related to point

---

[22] *See* Daniel O'Boyle, *Kalshi More Reliant On Sports Than DraftKings Or FanDuel, Data Shows*, InGame (Updated May 21, 2025), https://www.ingame.com/kalshi-sports-data-trading-volume/.

spreads, overs/unders, player proposition bets (such as bets on the first player to score a touchdown), and most recently, same-game parlays.[23]

35.     Kalshi tries to disguise its illegal gambling operation by using non-gambling terms like "sports trading" or "build your combo" so consumers do not think they are gambling. In reality, "sports trading" is just plain sports betting. And Kalshi's "build your combo" feature is just a classic parlay, where consumers combine multiple bets against the House, and are only paid out if they win all of them.

36.     Kalshi has now become primarily a sports-betting site. In September 2025, 90% of Kalshi's volume was from sports betting, with consumers placing approximately $2 billion in sports bets.[24] A graphic from the New York Times illustrates that the vast majority of bets on Kalshi are now from sports:[25]



Source: Kalshi

---

[23] *See* Brant James, *Prediction Market Parlays Are Here: Kalshi Posted Multi-Leg Bet For NFL Opener*, InGame (Sept. 17, 2025), https://www.ingame.com/kalshi-parlay-nfl-opener/,
[24] *See* Lev Akabas, *Kalshi's Volume Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025), https://www.sportico.com/business/sports-betting/2025/kalshi-nfl-football-trade-bet-volume-1234872696/
[25] *See* Ben Blatt and Amy Fan, *Is Sports Betting Illegal in Your State? Not if You Call It a 'Prediction Market.' Supra* note 2.

37.     As detailed below, Kalshi at times drops the mask and admits that it is a betting site, falsely marketing its platform as "legal sports betting." But Kalshi's betting platform is in no way legal. Consumers are tricked into betting against the House.

## II.    <u>Kalshi's product is unlawful sports betting.</u>

38.     When consumers sign up for Kalshi's platforms, they are told that they are legally betting on sports. For example, Kalshi ran an advertisement on Instagram featuring a photo of former quarterback Tom Brady (who is not affiliated with Kalshi), stating, "POV: You just found out that you can legally bet on the NFL in all 50 states using Kalshi":



39.     It similarly ran ads pretending to be news articles. One such ad stated, "Breaking News: Sports Betting in California is Now Legal: New York-headquartered prediction market Kalshi has legalized sports betting in all 50 states."



40.     But Kalshi does not offer legal sports betting—it offers illegal sports betting.

41.     New York State bans all forms of gambling under the state constitution, except for specifically named exceptions.[26]

42.     Chapter 59 of the Laws of 2021 amended N.Y. Racing, Pari-Mutuel Wagering and Breeding Law ("PML") section 1367 and added section 1367(a) to authorize mobile sports

---

[26] New York State Constitution, Article I, § 9

wagering to licensed companies. Section 1367-a(2)(a) of the PML provides that "[n]o entity shall administer, manage, or otherwise make available a mobile sports wagering platform to persons located in New York state unless licensed with the commission."

43.     "Sports wagering" under New York law is defined as: "wagering on sporting events or any portion thereof, or on the individual performance statistics of athletes participating in a sporting event, or combination of sporting events, by any system or method of wagering, including, but not limited to, in-person communication and electronic communication through internet websites accessed via a mobile device or computer, and mobile device applications; provided however that sports wagers shall include, but are not limited to, single-game bets, teaser bets, parlays, over-under bets, money line, pools, in-game wagering, in-play bets, proposition bets, and straight bets." PML § 1367(x).

44.     Other than wagering allowed under the PML through licensed entities, "[a]ll wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful." N.Y. Gen. Oblig. § 5-401. The statute directed the Gaming Commission to conduct a competitive bidding process to award licenses to not less than two mobile sports wagering platform providers that would host no less than four mobile sports wagering operators.

45.     In December 2021, the Commission awarded licenses for ten years to nine mobile sports wagering operators at a tax rate of 51 percent. Defendant is not among the nine operators.[27]

46.     The taxes from these licenses fund the Council on Problem Gambling, which

---

[27] N.Y. State Gaming Comm'n & N.Y. State Office of Addiction Servs. & Supports, *Annual Report* 2-3 (Apr. 19, 2023, updated June 29, 2023), https://www.gaming.ny.gov/pdf/06.29.23.MSWImpactReport.pdf.

monitors gambling addiction on the platforms, operates seven problem gambling resource centers across the state, and hosts events, workshops, and conferences to raise awareness regarding the risks and signs associated with problem gambling, and provides referrals to help addicts access appropriate services.[28]

47.    In addition to levying heavy taxes on licensed mobile sports wagering operators, the law requires operators to implement measures to prohibit minors from participating in sports wagering activity, and the Commission tracks alleged occasions of underage participation on the licensed platforms.[29] Additionally, and in recognition that gambling is an addictive and potentially dangerous behavior, New York State has developed a robust self-exclusion program for individuals "who recognize that they should no longer participate in legal gambling."[30]

48.    Pursuant to that law, the Commission also collects data and demographic information from sports wagering participants on legal platforms and those seeking help for gambling addiction.[31] This information includes:

    a.    Statistics and demographics regarding the number of individuals who accept problem gambling information upon entering voluntary self-exclusion;

    b.    Statistics and demographics relating to page interactions for individuals who visit sports wagering licensees' problem gambling web pages;

    c.    Statistics and demographics of sports wagering participants who, upon annual notification of hitting the statutory deposit limit, opt to take a "break" or acknowledge the limit and continue play;

---

[28] *Id.* at 6.
[29] *Id*. at 4.
[30] *Id.*
[31] *Id.* at 6-7.

      d.      Gathering information about trends in gambling disorders;

      e.      Providing training specific to mobile sports betting for counselors including training on engaging family members; and

      f.      Identifying specific geographic regions or vulnerable populations in need of services and developing programming to address those specific needs.

49. Consumers on Kalshi stake or risk "something of value upon the outcome of a contest of chance or a future contingent event not under [their] control or influence, upon an agreement or understanding that [they] will receive something of value in the event of a certain outcome," in violation of Racing Law § 1367(1)(t).

50. According to Racing Law § 1367-(a)(4)(b), "No entity shall directly or indirectly operate an unlicensed sports wagering platform in the state of New York, or advertise or promote such unlicensed platform to persons located in the state of New York." Kalshi is operating an unlicensed sports wagering platform in New York, and advertising its unlicensed platform.

51. Kalshi is operating a sports wagering enterprise in violation of New York law. It is operating illegally, avoiding the robust taxes that New York levies on legally operating companies and sidestepping the tightly-regulated environment that allows the state to monitor legalized gambling, identify problematic behavior, and act appropriately to ensure the legalized gambling experience is consistent with the values of the State of New York.

### III. Kalshi dupes consumers into thinking they are legally gambling against other consumers, when they are actually gambling against the House.

52. Unregulated sports betting (of any kind) is illegal in New York. In sports betting, consumers gamble against a bookmaker ("the House") on performance statistics of athletes or teams participating in a sporting event. The House sets betting lines, and consumers bet on either side of the House lines. The House tends to be highly sophisticated, and aims to set accurate

odds that give it the best chance of making money. The House also takes Vigorish ("the Vig"), which is a fee charged for accepting a wager. In other words, sports books pay out less for a winning bet than they take for a losing bet. The Vig and the sophistication of house betting lines make it very difficult for consumers to make long-term profits from sports betting.

53.     Even if consumers were betting only against consumers on sports, Kalshi operates a mobile sports wagering platform in violation of New York law, and illegally collects a fee for individuals placing sports wagers.

54.     But consumers on Kalshi do not only bet against each other—they also bet against the House. Kalshi engages in House betting. The wagers available to Kalshi's consumers are indistinguishable from those offered in casinos, sportsbooks, and other gambling establishments. A side-by-side comparison between FanDuel, a sportsbook, and Kalshi shows both offering identical bets on football games (FanDuel is on the left, Kalshi on the right). Both offer bets on with a baseline "spread" of Dallas winning by 2.5 points, and a baseline over/under of 47.5 total points.

 

55.     But Kalshi's egregious violation of New York law goes further still. Kalshi operates institutional "market makers," which also gamble against the consumer.

56.     Defendants Kalshi Trading LLC and KalshiEX, both wholly owned subsidiaries of Kalshi, operate as highly sophisticated "market makers," which bet against consumers when

their bets stray from Kalshi's internal projected odds.[32] A Kalshi representative called Kalshi Trading "one of many 'peers' in the peer-to-peer ecosystem."[33] Kalshi Trading is not a peer; it is the House.

57.    Kalshi also partners with hedge funds, such as Susquehanna International Group, to provide a sophisticated "market making" service for Kalshi by being on the other side of consumers' bets.[34]

58.    Market makers operate using a model indistinguishable from House betting in other illegal sportsbooks that the law expressly prohibits. While consumers may bet on either side of the House baseline in any sportsbook, the House sets the betting line, and profits when consumers pick wrong. Kalshi's market makers set the baseline. Upon information and belief, Kalshi coordinates directly with its market makers to set betting lines.

59.    To chase additional profits, market makers sometimes choose to favor one side of the ledger, providing liquidity to the market but taking on balance-sheet risk. Should the market maker wager incorrectly, it risks losing its money. To minimize this risk, market makers employ dedicated research teams, proprietary statistical models, and superior data and software. Additionally, market makers benefit from their unique contractual and technological integration with prediction markets, which provide them with financial benefits, reduced (or zero) fees, differing position limits, and enhanced access. These advantages greatly reduce market makers' financial exposure. As a result, individual consumers hardly stand a chance, all the while thinking they are just betting against other consumers.

---

[32] *See* Marc Novicoff, *The Company Making a Mockery of State Gambling Bans*, *supra* note 1.
[33] *See* Dan Bernstein and Eben Novy-Williams, *Kalshi's Trading Arm Muddles 'Peer-to-Peer' Claims*, Sportico (Sept. 11, 2025), https://www.sportico.com/business/sports-betting/2025/kalshi-trading-exchange-peer-house-1234870465/
[34] See Marc Novicoff, *The Company Making a Mockery of State Gambling Bans*, *supra* note 1.

60.     Kalshi's "combo" (parlay) bets further increase the wins for the House. Parlays traditionally produce the highest House return ("hold") in sports betting. Whereas straight bets produce a hold of approximately 5%, parlay betting can produce holds of approximately 30%.[35] By offering consumers parlays against the House, Kalshi dramatically increases its hold through illegal sports gambling. Kalshi's parlays require multiple correct bets to win a large payout, but if any bet is wrong, consumers lose. An example of Kalshi's parlay feature is below:[36]



61.     Because parlays involve exponential growth, and require winning every bet placed in order to pay out, they are bets against the House, rather than other consumers.

[35] See Jeffrey McMillan, *Kalshi Adds Parlays in Milestone Sports Shift*, PokerScout (Sep. 30, 2025), https://www.pokerscout.com/kalshi-adds-parlays-milestone-sports-shift/.

[36] Dustin Gouker, *The Closing Bell: How Big Was Kalshi's Second Attempt At Parlays?*, Event Horizon (Oct. 3, 2025), https://nexteventhorizon.substack.com/p/the-closing-bell-how-big-was-kalshis.

62.     Because Kalshi serves as a counterparty, shouldering the credit risk of all bets, and serving as its own market maker (facing off against consumers in the process), Kalshi and its partners are gambling "winners" at the expense of the consumer.

63.     Kalshi bills itself as a "peer-to-peer" market, and claims that this distinguishes it from a sportsbook.[37] Its official Reddit account posted the following argument about election betting:

> **kalshi_official OP** replied to **FuriousResolve** 9 mo. ago
>
> The first big difference is that we're a free market, not a book. We don't set the odds, we open a market and let people trade on it, and where the market settles is what the odds are. This is important because it means we're not profiting off of people from vig. In fact, we've waived all fees on election markets!
>
> Second, the market's opinion is really accurate. It's useful to the public to have a gauge of what the chances of a particular event happening are, particularly with massively consequential events like elections. Sportsbooks are a business, but we're a business and a public good.
>
> ⬆ -19 ⬇     ↗ Share     ⋯

64.     Co-founder Tarek Monsour stated to the New York Times, "Kalshi doesn't win when our customers lose, which creates a fair, transparent environment for people to trade."[38] But Kalshi's entire business model is that it *does* win when its customers lose.

65.     Consumers do not realize they are actually being tricked into sports betting against Kalshi. When consumers place bets on Kalshi, they face off against money provided by a sophisticated market maker on the other side of the ledger. Market makers make it possible for consumers to place illegal, unregulated wagers "against the House."

---

[37] *See* Dan Bernstein, *Kalshi Says Its 'Odds' Hats and 'Bet' Ads Don't Make It a Gambling App*, Sportico (July 15, 2025), https://www.sportico.com/business/sports-betting/2025/kalshi-odds-merch-store-prediction-market-1234861780/

[38] *See* Ben Blatt and Amy Fan, *Is Sports Betting Illegal in Your State? Not if You Call It a 'Prediction Market.' Supra* note 2.

IV.    **Illegal gambling is addictive and dangerous, especially when consumers do not have proper safeguards.**

66.    An October 2025 Kalshi commercial marketed its product as "[s]imple, regulated, and kind of addicting."[39] While it is not regulated or simple, it is addicting.

67.    As detailed below, Kalshi enables addictive gambling behavior by underage adults, problem gamblers, and others by enticing them to gamble with "free" money while ensuring them that they are legally gambling against peers.

68.    For example, Kalshi runs advertisements through sponsored influencers. One advertisement, through the sports betting publication, Covers, consumers are faced with offers that their deposits will receive a $10 bonus. In other words, consumers are enticed to join the platform because they will be receiving bonus funds.



69.    Kalshi ran similar advertisements by sponsoring professional gambler Daniel Negreanu (aka "Kid Poker"), who offers anyone signing up "$40 for free" when they put "100 in action," as well as the potential to win a $30,000 trip to the Bahamas.

---

[39] Dustin Gouker, *Kalshi Says It's 'Kind Of Addicting' In Instagram Post*, Event Horizon (Oct. 21, 2025), https://nexteventhorizon.substack.com/p/kalshi-says-its-kind-of-addicting



70.    Kalshi has sponsored a variety of influencers, including a ***15-year-old*** gaming influencer.





71.     On September 19, 2025, Kalshi also announced that it was targeting college

campuses. Kalshi publicly announced that it was partnering with college clubs as part of

"KalshiU" to bring in "the next 100M users."



72.     At no point in the sign-up process does Kalshi inform consumers that they will be

gambling against Kalshi (and does not mention that they will be gambling at all).



73.     Thus, Kalshi lures consumers onto "prediction" platforms, offering to match their contributions or provide "free" money upon a consumer signing up. Once signed up, consumers gamble without limits or guardrails against institutional investors with inside access while being charged a high Vig.

74.     Research on gambling addiction has demonstrated the grave problems that arise for individuals participating in sports betting, including addiction and suicidal ideation.[40]

75.     By stimulating the brain's reward system, gambling can lead to addiction and cause participants to risk valuable assets—*e.g.* money—in hopes of getting something of even greater value.[41]

---

[40] *An Explosion in Sports Betting Is Driving Gambling Addiction Among College Students*, The Ohio State University College of Social Work (Dec. 20, 2023), https://csw.osu.edu/blog/2023/12/20/an-explosion-in-sports-betting-is-driving-gambling-addiction-among-college-students/.

[41] Emily Sohn, *How gambling affects the brain and who is most vulnerable to addiction*, Monitor on Psych., July/August 2023, at 62, https://www.apa.org/monitor/2023/07/how-gambling-affects-the-brain.

76.     Furthermore, parlays are especially popular with younger members of the sports betting community.[42] The minimum age to gamble on Kalshi's platform is 18.[43]

77.     Thus, Kalshi makes unlawful gambling widely available to the public through its online and mobile platforms, presenting broader swaths of the population with the attendant risks of gambling without any of the safeguards. The risk is particularly damaging because the average age of the population participating in these unlawful games skews younger.[44]

## V.     States are Cracking Down on Unlawful Sports Betting.

78.     As discussed above, states are beginning to crack down on these unlawful sports-betting operations. Arizona, Illinois, Maryland, Montana, Nevada, New Jersey, New York, and Ohio sent cease-and-desist letters ordering Kalshi to cease and desist offering illegal sports betting under the guise of prediction markets. The Massachusetts Attorney General similarly concluded Kalshi's "event contracts" are illegal sports betting, and brought a lawsuit.[45]

79.     Additionally, in October 2023, the New York Gaming Commission adopted New York Rule 5602.1(a)(4), which explicitly outlaws this kind of "proposition betting," or bets made regarding the occurrence or non-occurrence during a game of an event not directly affecting the game's final outcome. That regulation states that "[c]ontests shall not be based on proposition

---

[42] Emily Giambalvo, Kati Perry, and Aaron Steckelberg, *Americans can't stop betting parlays. Sportsbooks are cashing in*, Washington Post (Oct. 9, 2025), https://www.washingtonpost.com/sports/interactive/2025/parlay-popularity-odds-sportsbooks/ ("Parlays are particularly popular among young people. Standard parlays accounted for 82 percent of all wagers for bettors age 21 to 24 in New Jersey for 2020, the most recent year that data is available.").

[43] *Signing Up as an Individual*, Kalshi, https://help.kalshi.com/account/signing-up/signing-up-as-an-individual ("Be 18 years or older").

[44] David Purdum, *Sports betting prevalent among young adults, survey says*, ESPN (May 24, 2023), https://www.espn.com/sports-betting/story/_/id/37721222/sports-betting-prevalent-young-adults-survey-says

[45] *AG Campbell Sues Online Prediction Market for Illegal and Unsafe Sports Wagering Operations*, Office of the Attorney General, https://www.mass.gov/news/ag-campbell-sues-online-prediction-market-for-illegal-and-unsafe-sports-wagering-operations.

betting or contests that have the effect of mimicking proposition betting. Contests in which a contestant must choose, directly or indirectly, whether an individual athlete or a single team will surpass an identified statistical achievement, such as points scored, are prohibited."[46]

80.     Plaintiffs welcome the crackdown, but it does not make them, or members of the putative class, whole. They seek the value of the money they paid into Kalshi's illegal gambling platforms.

## CLASS ALLEGATIONS

81.     **Class Definition:** Pursuant to the provisions of Fed. R. Civ. P. 23(a), 23(b)(2), and (b)(3), Plaintiffs bring this action on behalf of themselves, a Nationwide Class and Statewide Classes (collectively, "the Class"), defined as follows:

> All persons in the United States who spent money by wagering on Kalshi's mobile or web platforms.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

82.     In addition to the Nationwide Class, and pursuant to Federal Rules of Civil Procedure 23(c)(5), Plaintiffs seek to represent the following State Classes or subclasses as well as any subclasses or issue classes as Plaintiffs may propose and/or the Court may designate at the

---

[46] *Id.*

time of class certification:

**New York State Class:** All persons in New York who spent money by wagering on Kalshi's mobile or web platforms.

**Alabama Class:** All persons in Alabama who spent money by wagering on Kalshi's mobile or web platforms.

**Arkansas Class:** All persons in Arkansas who spent money by wagering on Kalshi's mobile or web platforms.

**California Class:** All persons in California who spent money by wagering on Kalshi's mobile or web platforms.

**Connecticut Class:** All persons in Connecticut who spent money by wagering on Kalshi's mobile or web platforms.

**District of Columbia Class:** All persons in the District of Columbia who spent money by wagering on Kalshi's mobile or web platforms.

**Florida Class:** All persons in Florida who spent money by wagering on Kalshi's mobile or web platforms.

**Georgia Class:** All persons in Georgia who spent money by wagering on Kalshi's mobile or web platforms.

**Illinois Class:** All persons in Illinois who spent money by wagering on Kalshi's mobile or web platforms.

**Indiana Class:** All persons in Indiana who spent money by wagering on Kalshi's mobile or web platforms.

**Kentucky Class:** All persons in Kentucky who spent money by wagering on Kalshi's mobile or web platforms.

3356326.6

**Maryland Class:** All persons in Maryland who spent money by wagering on Kalshi's mobile or web platforms.

**Massachusetts Class:** All persons in Massachusetts who spent money by wagering on Kalshi's mobile or web platforms.

**Michigan Class:** All persons in Michigan who spent money by wagering on Kalshi's mobile or web platforms.

**Minnesota Class:** All persons in Minnesota who spent money by wagering on Kalshi's mobile or web platforms.

**Mississippi Class:** All persons in Mississippi who spent money by wagering on Kalshi's mobile or web platforms.

**Missouri Class:** All persons in Missouri who spent money by wagering on Kalshi's mobile or web platforms.

**Montana Class:** All persons in Montana who spent money by wagering on Kalshi's mobile or web platforms.

**New Hampshire Class:** All persons in New Hampshire who spent money by wagering on Kalshi's mobile or web platforms.

**New Jersey Class:** All persons in New Jersey who spent money by wagering on Kalshi's mobile or web platforms.

**New Mexico Class:** All persons in New Mexico who spent money by wagering on Kalshi's mobile or web platforms.

**Ohio Class:** All persons in Ohio who spent money by wagering on Kalshi's mobile or web platforms.

**Oregon Class:** All persons in Oregon who spent money by wagering on Kalshi's mobile or web platforms.

**South Carolina Class:** All persons in South Carolina who spent money by wagering on Kalshi's mobile or web platforms.

**South Dakota Class:** All persons in South Dakota who spent money by wagering on Kalshi's mobile or web platforms.

**Tennessee Class:** All persons in Connecticut who spent money by wagering on Kalshi's mobile or web platforms.

**Vermont Class:** All persons in Vermont who spent money by wagering on Kalshi's mobile or web platforms.

**Virginia Class:** All persons in Virginia who spent money by wagering on Kalshi's mobile or web platforms.

**Washington Class:** All persons in Washington who spent money by wagering on Kalshi's mobile or web platforms.

**West Virginia Class:** All persons in West Virginia who spent money by wagering on Kalshi's mobile or web platforms.

**Wisconsin Class:** All persons in Wisconsin who spent money by wagering on Kalshi's mobile or web platforms.

83.     **Numerosity:** On information and belief, thousands of consumers fall into the definition of the Class. Members of the Class can be identified through Defendant's records, discovery, and other third-party sources.

84.     **Commonality and Predominance:** There are many questions of law and fact common to Plaintiffs' and the Class's claims, and those questions predominate over any

questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a.      Whether Kalshi's sports markets are unlawful under section 1400-12 of the New York Racing, Pari-Mutuel Wagering and Breeding Law;

b.      Whether Plaintiffs and each member of the Class lost money or anything of value on Kalshi;

c.      Whether Defendant violated sections 5-419 and -521 of the New York General Obligation Laws;

d.      Whether Defendant violated section 349 of New York's General Business Law; and

e.      Whether Defendant has been unjustly enriched as a result of its conduct.

85.     **Typicality:** Plaintiffs' claims are typical of the claims of other members of the Class in that Plaintiffs and the members of the Class sustained damages arising out of Defendant's wrongful conduct.

86.     **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class, as Plaintiffs and each member of the Class lost money playing Defendant's games of chance. Plaintiffs also have no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

87. **Policies Generally Applicable to the Class:** This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies that Plaintiffs challenge apply and affect members of the Class uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs. The factual and legal bases of Defendant's liability to Plaintiffs and to the other members of the Class are the same.

88. **Superiority:** This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be difficult if not impossible for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

89. Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class

Definition" based on facts learned through additional investigation and in discovery.

## CLAIMS FOR RELIEF

## I.    CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE CLASS

### NATIONWIDE COUNT I
### N.Y. GEN. OBLIG. LAW § 5-419
### Plaintiffs Against All Defendants

90.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if fully set forth herein.

91.    Section 5-419 of the New York General Obligations Law states that, "[a]ny person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not."

92.    Plaintiffs deposited money into accounts created and owned by Defendant for the purpose of engaging in unlawful betting and/or wagering.

93.    Defendant was engaged in an unlawful enterprise wherein consumers paid to participate in unlawful betting and/or wagering.

94.    Upon information and belief, Defendant operated its enterprise out of New York. Defendant processed online consumer payments in New York. Defendant's user agreements include a New York choice-of-law clause.

95.    Pursuant to § 5-419, Plaintiffs and the Class have a right to recover from Defendant the monies deposited as part of Defendant's unlawful betting and/or wagering enterprise.

## NATIONWIDE COUNT II
### N.Y. GEN. OBLIG. LAW § 5-421
### Plaintiffs Against All Defendants

96.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if fully set forth herein.

97.     Section 5-421 of the New York General Obligations Law states that, "[e]very person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

98.     Within the past three months, Plaintiffs deposited at least twenty-five dollars into accounts created and owned by Defendant for the purpose of engaging in unlawful betting and/or wagering.

99.     Plaintiffs lost the money they deposited by engaging in Defendant's unlawful betting and/or wagering games.

## NATIONWIDE COUNT III
### N.Y. GEN. BUS. LAW § 349
### Plaintiffs Against All Defendants

100.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if fully set forth herein.

101.     New York General Business Law section 349 establishes that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

102.     New York General Business Law section 349 applies to Defendant because Defendant engages in consumer conduct by, *inter alia*:

      a.     Providing an online platform wherein consumers pay to participate in illegal wagering and betting;

      b.     employing individuals in furtherance of its business;

      c.     soliciting individuals to become consumers of its product; and

      d.     Obtaining consumers' money in furtherance of its business.

103.    Defendant violated section 349 by, *inter alia*, misrepresenting the sports betting they offer as "legal sports betting," when it is unlicensed, and by misrepresenting its products as "peer-to-peer" when consumers are actually betting against Kalshi's internal market makers and partners.

104.    Defendant's conduct was material because it was likely to deceive reasonable consumers about the probability of winning their bets, the lawfulness of its business and services offered, and whether they were engaged in an addictive behavior.

105.    Defendant willfully misled Plaintiffs and Class members and induced them to rely on their misleading statements and/or omissions.

106.    Defendant accepted money from Plaintiffs and the Class members to participate in unlawful wagering or betting.

107.    Accordingly, Plaintiffs and Class members acted reasonably in relying on Defendant's misleading statements and/or omissions, the truth of which they could not have discovered through reasonable investigation.

108.    Defendant acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiffs' and Class members' rights.

109.    As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiffs and Class members have suffered and will continue to suffer injury,

ascertainable losses of money or property, and monetary and non-monetary damages.

110.    Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law.

**NATIONWIDE COUNT IV**
**UNJUST ENRICHMENT**
**Plaintiffs Against All Defendants**

111.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if fully set forth herein.

112.    Plaintiffs and Class Members conferred benefit upon Defendant by paying Defendant to participate in their unlawful betting and wagering scheme.

113.    Defendant appreciated or had knowledge of the benefits they received from Plaintiff and Class members.

114.    Plaintiffs and Class members reasonably understood that Defendant offered lawful consumer-to-consumer markets under New York state law.

115.    Defendants enriched themselves by saving the costs they reasonably should have expended on complying with regulations and tax requirements for offering betting and wagering services that were not properly advertised or permitted by law.

116.    Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' benefits conferred.

117.    Plaintiffs and Class members have no adequate remedy at law.

118.    Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

## II.     STATE SPECIFIC CLAIMS

**CALIFORNIA COUNT I**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL")**
**(on behalf of Plaintiff Crystal Pelayo and the California Class)**
**Plaintiffs Against All Defendants**

119.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if fully set forth herein.

120.    Kalshi and Plaintiffs are "persons" within the meaning of the California UCL.

121.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

122.    Kalshi has violated the UCL's proscription against engaging in "unlawful" conduct by virtue of its violations of, inter alia, the following laws:

a.    California's Gambling Control Act (Cal. Bus. & Prof. Code §§ 19800, et seq.): Sections 19801 and 19850 of the Gambling Control Act provide that unless licensed, state law prohibits commercially operated gambling facilities; that no new gambling establishment may be opened except upon affirmative vote of the electors; that all gambling operations and persons having significant involvement therein shall be licensed, registered, and regulated; and that all persons who deal, operate, carry on, conduct, maintain or expose for play any gambling game shall apply for and obtain a valid state gambling license. Kalshi has not applied for or obtained any state gambling license, and therefore violates California's Gambling Control Act. As the California legislature reaffirmed in 2008, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

b.    California Penal Code Section 330, which provides in relevant part that "[e]very person who . . . conducts, either as owner or employee . . . any banking or percentage

game played with . . . any device, for money, checks, credit, or other representative of value . . . is guilty of a misdemeanor." CAL. PENAL CODE § 330. A "banking game" refers to a situation where the "House" is a participant in the game, taking on all contestants, paying all winners, and collecting from all losers. *See Sullivan v. Fox*, 189 Cal. App. 3d 673, 678 (1987). And a "percentage game" refers to a situation where the house collects a portion of the bets or wagers made by contestants, but is not directly involved in game play. *See id.* at 679. Kalshi operates both illegal banking games when it trades as the House through its market makers and illegal percentage games when it takes fees on bets made by consumers.

        c.        California Penal Code Section 337a, which prohibits additional conduct, including: i) "Pool selling or bookmaking, with or without writing, at any time or place." CAL. PENAL CODE § 337a(a)(1); ii) "[R]eceiv[ing], hold[ing], or forward[ing] . . . in any manner whatsoever, any money . . . staked, pledged, bet or wagered, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever." *Id.* at (a)(3). "[A]t any time or place, record[ing], or register[ing] any bet or bets, wager or wagers, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever." *Id.* at (a)(4). Kalshi acts as a bookmaker, and accepts pooled bets on the results of sports events.

        d.        California Penal Code § 337j(a)(2): Kalshi violates Cal. Penal Code §

337j(a)(2) by "receiv[ing], directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game." Kalshi directly receives compensation by taking a share of consumers' bets.

123.     Kalshi has, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into believing the operation of its gambling website is lawful in California, when it is not, and has further tricked consumers into believing they are not gambling against the House, causing Plaintiffs to be tricked out of millions of dollars.

124.     Plaintiffs and the Class have a right to recover from Kalshi the monies deposited as part of Kalshi's unlawful betting and/or wagering enterprise.

**FLORIDA COUNT I**
**VIOLATION OF FLORIDA GAMBLING LAWS**
**Fla. Stat. §§ 849.12, 849.26, 849.29**
**(on behalf of Plaintiff Jacob Tingle and the Florida Class).**
**Plaintiffs Against All Defendants**

125.     Plaintiffs bring this count against all Defendants under Fla. Stat. §§ 849.12, 849.26, and 849.29.

126.     Fla. Stat. § 849.12 ("Money and prizes to be forfeited") states, in part: "All sums of money and every other valuable thing drawn and won as a prize, or as a share of a prize, or as a share, percentage or profit of the principal promoter or operator…used or displayed in or in connection with any illegal gambling or any illegal gambling device contrary to the laws of this state, shall be forfeited, and may be recovered by civil proceedings."

127.     Plaintiffs bring this civil proceeding to recover money wagered in connection with Kalshi's illegal gambling operation, within the definitions of Fla. Stat. § 849.12.

128.     Fla. Stat. §§ 849.26 ("Gambling contracts declared void") and 849.29 ("Persons against whom suits may be brought to recover on gambling contracts") collectively state that

illegal gambling contracts are void, and that suit to recover losses may be brought against any or all of: "The winner of the money or property lost in the gambling transaction; every person who, having direct or indirect charge, control or management, either exclusively or with others, of the place where the gambling transaction occurs, procures, suffers or permits such place to be used for gambling purposes; whoever promotes, sets up or conducts the gambling transaction in which the loss occurs or has an interest in it as backer, vendor, owner or otherwise; and, as to anything of value other than money, the transferees and assignees, with notice, of the persons hereinabove specified in this section."

129.     Upon information and belief, thousands of individuals within Florida have lost—and continue to lose—money by playing at games of chance (i.e., gambling) with Kalshi.

130.     Defendants are "winners" of money or property in illegal gambling transactions, and also "control," "manage," "promote," and "set up" gambling transactions in which the losses occur, within the definitions of Fla. Stat. §§ 849.26 and 849.29.

131.     Plaintiffs and the Class have a right to recover from Kalshi the monies deposited as part of Kalshi's unlawful betting and/or wagering enterprise.

### NEW MEXICO COUNT I
### VIOLATION OF N.M. STAT. ANN. § 44-5-1
### (on behalf of Plaintiff Isaiah Esquibel and the New Mexico Class).
### Plaintiffs Against All Defendants

132.     Plaintiffs bring this count against all Defendants under N.M. Stat. Ann. § 44-5-1.

133.     N.M. Stat. Ann. § 44-5-1 states, "Any person who shall lose any money or property at any game at cards, or at any gambling device, may recover the same by action of debt, if money; if property, by action of trover, replevin or detinue."

134.     Upon information and belief, thousands of individuals within New Mexico have lost—and continue to lose—money by playing at games of chance (i.e., gambling) with Kalshi.

135.    Each Plaintiff qualifies as a "[p]erson" authorized to sue for the recovery of losses at gaming within the meaning of N.M. Stat. Ann. § 44-5-1.

136.    Plaintiffs and the Class have a right to recover from Kalshi the monies deposited as part of Kalshi's unlawful betting and/or wagering enterprise.

**PRAYER FOR RELIEF**

137.    Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter an Order:

a.    Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as representatives of the Class, and appointing their counsel as class counsel;

b.    Declaring that Defendant's conduct, as set out above, violates sections 5-419 and -421 of the New York General Obligations Law and section 349 of the New York General Business Law;

c.    Entering judgment against Defendant, in the amount of the losses suffered by Plaintiffs and each member of the Class;

d.    Enjoining Defendant from continuing the challenged conduct;

e.    Awarding damages to Plaintiffs and the Class members in an amount to be determined at trial, including trebling as appropriate;

f.    Awarding restitution to Plaintiffs and Class members in an amount to be determined at trial, and requiring disgorgement of all benefits that Defendant unjustly received;

g.    Awarding reasonable attorney's fees and expenses; Awarding pre- and post-judgment interest, to the extent allowable;

h.    Entering judgment for injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Class; and

i.      Awarding such other and further relief as equity and justice require.

## **JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated:  November 26, 2025          Respectfully submitted,


By:   */s/ David Stellings*
      David Stellings
      Wilson M. Dunlavey
      Jacob S. Miller
      **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
      250 Hudson Street, 8th Floor
      New York, NY 10013-1413
      Telephone: 212.355.9500
      Facsimile: 212.355.9592
      dstellings@lchb.com
      wdunlavey@lchb.com
      jmiller@lchb.com

-42-