## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CRYSTAL PELAYO, JACOB TINGLE, ISAIAH ESQUIBEL, GINO GADALETA, BRICE GAMBILL, RALEIGH MELANCON, MICAH PARKER, SIMON RACHIE, WILLIAM BRIDGES, SAMUEL GORDON, TYRONE DAVIS, RESHAWNA JONES, TYLER KOESSLER, CHRISTOPHER MAI, JACKSON MILLIKIN, AND TIMOTHY SMITH individually and on behalf of others similarly situated,

    Plaintiffs,

   -against-

KALSHI INC.; KALSHIEX LLC; KALSHI KLEAR INC.; KALSHI KLEAR LLC; and KALSHI TRADING LLC,

    Defendants.

INDEX NO. 1:25-cv-9913

**FIRST AMENDED COMPLAINT—CLASS ACTION**

**JURY DEMAND**

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................................. 1

PARTIES ............................................................................................................................... 6

JURISDICTION AND VENUE ......................................................................................... 11

FACTUAL ALLEGATIONS .............................................................................................. 12

I.      The Prediction Market Industry ....................................................................... 12

II.     Kalshi's product is unlawful sports betting. ................................................... 17

III.    Kalshi dupes consumers into thinking they are legally gambling against other
        consumers, when they are actually gambling against the House. .................... 22

IV.     Even if consumers were only gambling directly against other consumers, Kalshi
        would still be profiting off of them by operating an illegal sportsbook. ......... 31

V.      Illegal gambling is addictive and dangerous, especially when consumers do not
        have proper safeguards. ................................................................................... 33

VI.     States are cracking down on unlawful sports betting...................................... 39

CLASS ALLEGATIONS .................................................................................................... 40

CLAIMS FOR RELIEF ...................................................................................................... 46

I.      CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE CLASS ...................... 46

II.     STATE SPECIFIC CLAIMS ............................................................................. 50

PRAYER FOR RELIEF ..................................................................................................... 59

JURY DEMAND ................................................................................................................. 60

1.      Plaintiffs Crystal Pelayo, Jacob Tingle, Isaiah Esquibel, Gino Gadaleta, Brice Gambill, Raleigh Melancon, Micah Parker, Simon Rachie, William Bridges, Samuel Gordon, Tyrone Davis, Reshawna Jones, Tyler Koessler, Christopher Mai, Jackson Millikin, and Timothy Smith bring this action, individually and on behalf of all others similarly situated, against KalshiEx LLC, Kalshi Inc., Kalshi Klear LLC, Kalshi Klear Inc., and Kalshi Trading LLC (collectively "Kalshi" or "Defendant") to recover wagers from Defendant's illegal sports gambling operation. Plaintiffs allege the following upon personal knowledge as to themselves and their own acts and experiences, and upon information and belief, including investigations conducted by their attorneys, as to all other matters.

## NATURE OF THE ACTION

2.      Defendant Kalshi owns and operates an online and app-based platform that it markets as a "prediction market." In actuality, however, Kalshi operates an unlicensed sports gambling platform, which is accessible to any resident of the United States who is over the age of 18.[1] By operating unlicensed sports betting, Defendant has violated gambling laws, engaged in illegal deceptive activity, and unjustly enriched itself at the expense of millions of consumers. Accordingly, Plaintiffs, on behalf of themselves and a Class of similarly situated individuals, bring this lawsuit to recover their wagers, as well as costs and attorneys' fees.

3.      Since January 2025, Kalshi has been classifying online sports bets on its platform as "event contracts," including in states where online sports betting is categorically illegal.[2] Accordingly, consumers place bets on Kalshi on the outcome of sports games, individual player

---

[1] Marc Novicoff, *The Company Making a Mockery of State Gambling Bans,* The Atlantic (Oct. 26, 2025), https://www.theatlantic.com/ideas/archive/2025/10/sports-betting-kalshi-cftc/684689/.
[2] Ben Blatt and Amy Fan, *Is Sports Betting Illegal in Your State? Not if You Call It a 'Prediction Market.'* NY Times (Oct. 5, 2025), https://www.nytimes.com/2025/10/05/upshot/sports-betting-prediction-markets.html.

metrics, team results, and or a combination (parlays). These bets do not differ materially from bets available at casinos or sportsbooks. Indeed, Kalshi markets its product as betting on sports. For example, it markets its site to consumers as an opportunity (with devil horns) to "Bet on the NFL," claiming that it is "Legal in 50 states."[3]



---

[3] Kalshi has been running these type of ads since February 2025. *See* Dustin Gouker, *Kalshi Is Advertising That 'Sports Betting' Is Legal In California, Texas*, Event Horizon (Sep. 17, 2025), https://nexteventhorizon.substack.com/p/kalshi-is-advertising-sports-betting-legal-in-california-texas; Marc Novicoff, *The Company Making a Mockery of State Gambling Bans*, *supra* note 1.

4.      Kalshi's illegal online sportsbook has become its primary source of revenue. In September 2025, 90% of Kalshi's volume of bets placed was from sports betting, with U.S. consumers placing more than $2 billion in sports bets.[4] A weekly volume chart shows the dramatic growth of sports betting on Kalshi.



**A World of Wagers**
Weekly notional volume on Kalshi, by category

Sources: Dune, Kalshi
Note: Weeks are Monday to Sunday.

---

[4] *See* Lev Akabas, *Kalshi's Volume Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025), https://www.sportico.com/business/sports-betting/2025/kalshi-nfl-football-trade-bet-volume-1234872696/

5.      In October 2025, Kalshi closed a $300 million funding round, with a valuation of $5 billion.[5] In November 2025, Kalshi raised a $1 billion round at a $11 billion valuation, which continues to grow.[6]

6.      In New York, where Kalshi is headquartered, operating a sports betting platform is illegal without a license, and Kalshi does not have one. Licensing plays an important role in sports betting because sports betting is a form of gambling, a highly addictive behavior. Licenses allow the state to maintain gaming integrity, regulate who wagers money (including restricting minors and compulsive gamblers), and prevent unfair or misleading advertising. Without such oversight, sportsbooks are able to mislead the public, including duping consumers into thinking they are not engaging in the highly addictive behavior of gambling when they are, creating betting lines with extremely poor odds of winning, misrepresenting consumers' chances of winning, and ultimately collecting money from consumers who do not realize the implications of their bets.

7.      The New York State Gaming Commission has come to the same conclusion. On October 24, 2025, it sent Kalshi a letter informing Kalshi that Kalshi was operating an unlicensed mobile betting platform in violation of New York law.[7] Accordingly, it demanded that Kalshi "cease and desist immediately from illegally operating, advertising, promoting, administering, managing or otherwise making available sports wagering and/or a mobile sports

---

[5] Anthony Clarke, *Kalshi Pulls in $300M and Rockets to a $5B Valuation*, Yahoo Finance (Oct. 10, 2025), https://finance.yahoo.com/news/kalshi-pulls-300m-rockets-5b-213923258.html.
[6] Marina Temkin, *Source: Kalshi's valuation jumps to $11B after raising massive $1B round*, TechCrunch (Nov. 20, 2025), https://techcrunch.com/2025/11/20/source-kalshis-valuation-jumps-to-11b-after-raising-massive-1b-round/.
[7] *New York Slaps Kalshi With Cease-and-Desist Order*, Bookmakers Review (Oct. 30, 2025), https://www.bookmakersreview.com/industry/new-york-kalshi/

wagering platform in New York[.]"[8] However, Kalshi continues to operate its illegal sports betting platform out of its New York headquarters to residents of all states.

8.      Other state regulators agree with the New York State Gaming Commission. State Attorneys General and gaming commissions in Arizona, Connecticut, Illinois, Maryland, Montana, Nevada, New Jersey, and Ohio have also sent letters ordering Kalshi to cease and desist offering illegal sports betting under the guise of prediction markets. The Massachusetts Attorney General similarly concluded Kalshi's "event contracts" are illegal sports betting, and brought a lawsuit.[9]

9.      The National Council on Problem Gambling, a non-profit that seeks to minimize the economic and social costs associated with gambling addiction, also wrote a letter raising concerns that prediction markets such as Kalshi could lead to harms for problem gamblers because of insufficient age restrictions, betting limits, or other safeguards for sports betting. The Council stated that "[f]rom a problem gambling standpoint, betting on futures is functionally gambling."[10]

10.     Even Kalshi's own lawyers have argued that laws regulating prediction markets do not cover sports betting. A January 2024 Kalshi brief acknowledged that regulators did not want event contracts to "launder casino-style or sports gambling through the derivatives markets."[11] According to Kalshi, "gaming" referred to contracts contingent on games—for

---

[8]  *Id.*
[9]  *AG Campbell Sues Online Prediction Market for Illegal and Unsafe Sports Wagering Operations*, Office of the Attorney General, https://www.mass.gov/news/ag-campbell-sues-online-prediction-market-for-illegal-and-unsafe-sports-wagering-operations.
[10] National Council on Problem Gambling, *Re: Prediction Markets Roundtable*, March 10, 2025, https://www.cftc.gov/media/11956/NationalCouncilonProblemGambling031025/download
[11] *KalshiEX LLC v. Commodity Futures Trading Commission*. Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, 1:23-cv-03257-JMC, Dkt. 17-1 at 16, (D.D.C. Jan. 25, 2024).

example, "whether a certain team will win the Super Bowl."[12] In November 2024, Kalshi again stated in a filing that a wager is illegal gambling "if it is contingent on a game or a game-related event."[13] The filing explained: "The classic example is a contract on the outcome of a sporting event; as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets."[14]

11.    But months after publicly stating that sports betting "contracts" are gambling, which is illegal without a sports betting license, Kalshi has made the business decision to offer bets on which team would win the Super Bowl without obtaining a sports betting license.

12.    By operating unlicensed sports betting, Kalshi has violated gambling laws, engaged in illegal deceptive activity, and unjustly enriched itself at the expense of hundreds of thousands of consumers. Accordingly, Plaintiffs on behalf of themselves and a Class of similarly situated individuals, bring this lawsuit to recover their wagers, as well as costs and attorneys' fees.

## **PARTIES**

13.    Crystal Pelayo is a natural person and a citizen of the state of California. She signed up through the Kalshi App in California in 2024. Ms. Pelayo was not informed by Kalshi of the nature of its games—that it operates an unlicensed sportsbook—when she wagered and lost money on the Kalshi App.

14.    Jacob Tingle is a natural person and a citizen of the state of Florida. He signed up through the Kalshi App in Florida in October 2025. Mr. Tingle was not informed by Kalshi of

---

[12] *Id.*

[13] *KalshiEX LLC*, Plaintiff-Appellee, v. *Commodity Futures Trading Commission*, Defendant-Appellant, No. 23-cv-03257-JMC, Brief of KalshiEx LLC (D.C. Cir. Nov. 15, 2024).

[14] *Id.*

the nature of its games—that it operates an unlicensed sportsbook—when he wagered and lost money on the Kalshi App.

15.    Isaiah Esquibel is a natural person and a citizen of the state of New Mexico. He signed up through the Kalshi App in New Mexico in October 2025. Mr. Esquibel was not informed by Kalshi of the nature of its games—that it operates an unlicensed sportsbook—when he wagered and lost money on the Kalshi App.

16.    Gino Gadaleta is a natural person and a citizen of the state of New York. He signed up through the Kalshi App in New York in October 2024. Mr. Gadaleta was not informed by Kalshi of the nature of its games—that it operates an unlicensed sportsbook—when he wagered and lost money on the Kalshi App.

17.    Brice Gambill is a natural person and a citizen of the state of New York. He signed up through the Kalshi App in New York in November 2025. Mr. Gambill was not informed by Kalshi of the nature of its games—that it operates an unlicensed sportsbook—when he placed a wager on the Kalshi App.

18.    Raleigh Melancon is a natural person and a citizen of the state of Texas. He signed up through Kalshi's website in Texas in October 2025. Mr. Melancon was not informed by Kalshi of the nature of its games—that it operates an unlicensed sportsbook—when he wagered and lost money on Kalshi's website.

19.    Micah Parker is a natural person and a citizen of the state of Arizona. He signed up through the Kalshi App in Arizona in approximately October 2025. Mr. Parker was not informed by Kalshi of the nature of its games—that it operates an unlicensed sportsbook—when he wagered and lost money on the Kalshi App.

20.     William Bridges is a natural person and a citizen of the State of Georgia. He signed up for and used the Kalshi App in Georgia beginning in approximately September 2025. Mr. Bridges is a sophisticated market participant with experience in finance, investing, and regulated markets. He reasonably relied on Kalshi's representations that it operated as a lawful, CFTC-regulated prediction market and not as a sportsbook or gambling platform. Kalshi affirmatively marketed its sports-related products as compliant, regulated financial instruments. Kalshi did not clearly, conspicuously, or meaningfully disclose that these markets functioned in substance as sports wagering, nor that participation carried the legal and structural risks associated with an unlicensed sportsbook. Relying on Kalshi's representations, Mr. Bridges participated in Kalshi's sports markets and suffered monetary losses.

21.     Samuel Gordon is a natural person and a citizen of the state of Illinois. He signed up through the Kalshi App in Illinois in 2024. Mr. Gordon was not informed by Kalshi of the nature of its games—that it operates an unlicensed sportsbook—when he wagered and lost money on the Kalshi App.

22.     Tyrone Davis is a natural person and a citizen of the state of Illinois. He signed up through the Kalshi App in Illinois in approximately August 2024. Mr. Davis was not informed by Kalshi of the nature of its games—that it operates an unlicensed sportsbook— when he wagered and lost money on the Kalshi App.

23.     Reshawna Jones is a natural person and a citizen of the state of Florida. She signed up through the Kalshi App in Florida in November 2025. Ms. Jones was not informed by Kalshi of the nature of its games—that it operates an unlicensed sportsbook—when she wagered and lost money on the Kalshi App. Ms. Jones was shown misleading and incorrect information

about a college basketball game on Kalshi's website alongside betting odds, which induced her to submit a wager that she otherwise would not have on the result of the game

24.     Tyler Koessler is a natural person and a citizen of the state of Oregon. He signed up through the Kalshi App in Washington in 2024, and has primarily used Kalshi in Oregon. Mr. Koessler was not informed by Kalshi of the nature of its games—that it operates an unlicensed sportsbook—when he wagered and lost money on the Kalshi App.

25.     Christopher Mai is a natural person and a citizen of the state of California. He signed up through the Kalshi website in California in October 2025. Mr. Mai was not informed by Kalshi of the nature of its games—that it operates an unlicensed sportsbook—when he wagered and lost money on Kalshi.

26.     Jackson Millikin is a natural person and a citizen of the state of Michigan. He signed up through the Kalshi App in Michigan in approximately November 2025. Mr. Millikin was not informed by Kalshi of the nature of its games—that it operates an unlicensed sportsbook— when he wagered and lost money on the Kalshi App.

27.     Simon Rachie is a natural person and a citizen of the state of Minnesota. He signed up through the Kalshi App in Minnesota in Summer 2025. Mr. Rachie was not informed by Kalshi of the nature of its games—that it operates an unlicensed sportsbook—when he wagered and lost money on the Kalshi App.

28.     Timothy Smith is a natural person and a citizen of the state of Virginia. He signed up through the Kalshi App in Minnesota in 2024. Mr. Smith was not informed by Kalshi of the nature of its games—that it operates an unlicensed sportsbook—when he wagered and lost money on the Kalshi App. Kalshi's payouts on a wager placed by Mr. Smith in November 2025 did not correspond to the scores reported by sources Kalshi purported to use to determine the

payout. Kalshi reported an outcome that differed from the scores reported by ESPN, Fox, and Yahoo, causing Mr. Smith to lose his wager.

29.    Defendant Kalshi Inc. is a Delaware corporation headquartered at 416 West 13th Street, Room 207, New York, NY 10014. Upon information and belief, it is the parent company of all other Kalshi entities (collectively "Kalshi"). Kalshi operates a "prediction market," allowing consumers to place illegal, unregulated wagers. Upon information and belief, Kalshi operates its business primarily through its headquarters in New York, processes payments in New York, and designates New York as the governing law in its terms of use.

30.    Defendant KalshiEX LLC is a Delaware corporation headquartered at 416 West 13th Street, Room 207, New York, NY 10014. Upon information and belief, KalshiEX is a "contract market" or an "exchange," and is a wholly owned subsidiary of Kalshi Inc. Together with the other Kalshi entities, Kalshi operates a "prediction market," allowing consumers to place illegal, unregulated wagers. Upon information and belief, Kalshi operates its business primarily through its headquarters in New York, processes payments in New York, and designates New York as the governing law in its terms of use.

31.    Defendant Kalshi Klear Inc. is a Delaware corporation headquartered at 416 West 13th Street, Room 207, New York, NY 10014. Upon information and belief, it is a wholly owned subsidiary of Kalshi Inc. Kalshi Klear Inc. is the holding company for Kalshi Klear LLC, which operates Kalshi's in-house clearinghouse. Together with the other Kalshi entities, Kalshi operates a "prediction market," allowing consumers to place illegal, unregulated wagers. Upon information and belief, Kalshi operates its business primarily through its headquarters in New York, processes payments in New York, and designates New York as the governing law in its terms of use.

-10-

32.     Defendant Kalshi Klear LLC is a Delaware corporation headquartered at 416 West 13th Street, Room 207, New York, NY 10014. Upon information and belief, it is an in-house clearinghouse for KalshiEX LLC, and is a wholly owned subsidiary of Kalshi Klear Inc. Together with the other Kalshi entities, Kalshi operates a "prediction market," allowing consumers to place illegal, unregulated wagers. Upon information and belief, Kalshi operates its business primarily through its headquarters in New York, processes payments in New York, and designates New York as the governing law in its terms of use.

33.     Defendant Kalshi Trading LLC is a Delaware corporation headquartered at 416 West 13th Street, Room 207, New York, NY 10014. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. In concert with other Kalshi entities, it operates a prediction market, allowing the State's residents to place illegal, unregulated wagers. Kalshi Trading LLC operates as a "market maker" for Kalshi. Upon information and belief, Kalshi operates its business primarily through its headquarters in New York, processes payments in New York, and designates New York as the governing law in its terms of use.

## JURISDICTION AND VENUE

34.     Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

35.     The Court has personal jurisdiction over Defendant because the wrongful conduct by Defendant occurred in and emanated from this District.

36.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District.

## FACTUAL ALLEGATIONS

I.    **The Prediction Market Industry**

37.    A "prediction market" allows for the purchase and sale of "event contracts." Event contracts are "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency," "other than a change in the price, rate, value, or levels of a commodity." 7 U.S.C. § 7a-2(c)(5)(C)(i). In other words, event contracts pay out if a future event does (or does not) occur.

38.    Defendant Kalshi is a private technology company founded in 2018 by Tarek Mansour and Luana Lopes Lara. Kalshi operates both a website and mobile application out of its New York headquarters. Kalshi claims to operate a prediction market for event contracts.

39.    According to co-founder Tarek Mansour, "The long-term vision [of Kalshi] is to financialize everything and create a tradable asset out of any difference in opinion."[15] The company name Kalshi (sometimes transliterated from Arabic as 'kal shai') means "everything" or "anything" in Arabic.

40.    When Kalshi began offering markets in June 2021, it offered binary yes-or-no contracts about whether an event would occur, such as "will a recession start by the second quarter of 2022" or "will income taxes on the highest income bracket increase by the end of 2021."[16] Consumers could buy either "Yes" or "No" at some variable price ranging from $0.01 to $0.99. Back then, Kalshi distinguished itself from casinos by arguing "the economic usefulness of hedging outcomes and market pricing are two elements that make Kalshi different

---

[15] *See* AJ Dellinger, *Kalshi CEO Says He Wants to Monetize 'Any Difference in Opinion'*, Gizmodo (Dec. 4, 2025), https://gizmodo.com/kalshi-ceo-says-he-wants-to-monetize-any-difference-in-opinion-2000695320.

[16] *See* Jesse Pound, "This new exchange lets investors vote yes or no on major events to hedge their portfolios," CNBC (Dec. 29, 2021), https://www.cnbc.com/2021/12/29/this-new-exchange-lets-investors-vote-yes-or-no-on-major-events-to-hedge-their-portfolios.html.

from a casino."[17] It also asserted that it only made its money from a "transaction fee," unlike casinos where "the revenue they make is out of their customer's losses."[18]

41.     But Kalshi has changed its tune. In 2024, Kalshi started offering political election contracts, allowing consumers to bet on which candidate would win the 2024 presidential election, or which party would control Congress.[19] Election betting drew significantly more consumers to Kalshi. In October 2024, consumers bet more than $100 million on Kalshi's election markets.[20] Monsour stated: "It's actually the best mechanism to get more truth about who's actually going to win. We're letting the market speak instead of pundits, pollsters, people, political figures, people with biases or conflicts of interest, people that had incentives or not."[21]

42.     Then in January 2025, Kalshi got greedy. It fundamentally changed its business model and began to offer illegal sports betting falsely styled as event contracts.[22] Mansour posted, "Today, on the heels of our explosive growth, Kalshi takes its next big step: **Sports**. Legal sports markets, accessible to Americans in all 50 states."

---

[17] *Id.*

[18] *Id.*

[19] *See* Tarek Mansour, "It's official: You can now trade on the U.S. Presidential Election," Kalshi (Oct. 4, 2024), https://news.kalshi.com/p/official-kalshi-makes-history-with-100-legal-election-trading.

[20] *See* Lydia Moynihan, *Kalshi's daring bet on election betting is paying off — to the tune of $100 million*, NY Post (Oct. 31, 2024), https://nypost.com/2024/10/31/business/kalshis-daring-bet-on-election-betting-is-paying-off./

[21] *Id.*

[22] *See* Justin Byers, "Prediction market Kalshi expands reach with sports event contracts," SBC Americas (Jan. 23, 2025), https://sbcamericas.com/2025/01/23/kalshi-expands-sports-event-contracts/.

3384758.1



43.    Kalshi's official account also posted. It stated there would be "sports trading" in all 50 states. It also marketed its products as having "no house," and "Live trading during the game[.]"



3384758.1

44.    On its website, Kalshi publicly stated that it offered "100% legal sports trading," but was "not a sportsbook."[23] It further stated, "[W]e are 100% legal everywhere in the US, including Washington, DC and other US Territories. Hell, if you happen to be in Guam or American Samoa, we've still got you covered."[24] And Kalshi added, "When you use Kalshi, you are trading on our platform, not against our platform."[25]

45.    By May 2025, more than 75% of Kalshi's volume came from sports betting, and public reports indicated Kalshi made a larger percentage of its money from sports than certain licensed sports betting companies.[26]

46.    By September 2025, Kalshi expanded still further into illegal sports gambling. It began offering categories that mirror traditional sports betting, including bets related to point spreads, overs/unders, player proposition bets (such as bets on the first player to score a touchdown), and most recently, same-game parlays.[27]

47.    Kalshi tries to disguise its illegal gambling operation by using non-gambling terms like "investing," "sports trading," or "combos" so consumers do not think they are gambling. In reality, "sports trading" is just plain sports betting. And Kalshi's "build your combo" feature is just a classic parlay, where consumers combine multiple bets against the House, and are only paid out if they win all of them.

---

[23] *See* Terry Oldreal, *Game on: Kalshi brings 100% legal sports trading to all 50 states*, Kalshi (Jan. 24, 2025), https://news.kalshi.com/p/game-on-kalshi-sports-trading-is-now-100-legal-in-all-50-states-2.

[24] *Id.*

[25] *Id.*

[26] *See* Daniel O'Boyle, *Kalshi More Reliant On Sports Than DraftKings Or FanDuel, Data Shows*, InGame (Updated May 21, 2025), https://www.ingame.com/kalshi-sports-data-trading-volume/.

[27] *See* Brant James, *Prediction Market Parlays Are Here: Kalshi Posted Multi-Leg Bet For NFL Opener*, InGame (Sept. 17, 2025), https://www.ingame.com/kalshi-parlay-nfl-opener/,

48.    On September 29, 2025, former Kalshi employee Adhi Rajaprabhakaran posted publicly in a thread about Kalshi's sports betting, "this is gambling. it's gambling. prediction markets are gambling."



49.    Kalshi has now become primarily a sports-betting site. In September 2025, 90% of Kalshi's volume was from illegal sports betting, with consumers placing approximately $2 billion in sports bets on the unlicensed platform.[28] A graphic from the New York Times illustrates that the vast majority of bets on Kalshi are now from sports:[29]

---

[28] *See* Lev Akabas, *Kalshi's Volume Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025), https://www.sportico.com/business/sports-betting/2025/kalshi-nfl-football-trade-bet-volume-1234872696/
[29] *See* Ben Blatt and Amy Fan, *Is Sports Betting Illegal in Your State? Not if You Call It a 'Prediction Market.' Supra* note 2.





Source: Kalshi

50.     As detailed below, Kalshi at times drops the mask and admits that it is a betting site, falsely marketing its platform as "legal sports betting." But Kalshi's betting platform is in no way legal.

**II.    Kalshi's product is unlawful sports betting.**

51.     When consumers sign up for Kalshi's platforms, they are told that they are legally betting on sports. For example, Kalshi ran an advertisement on Instagram featuring a photo of former quarterback Tom Brady (who is not affiliated with Kalshi), stating, "POV: You just found out that you can legally bet on the NFL in all 50 states using Kalshi":



-17-

52.     It similarly ran ads deceptively pretending to be news articles. One such ad stated, "Breaking News: Sports Betting in California is Now Legal: New York-headquartered prediction market Kalshi has legalized sports betting in all 50 states."



53.     Kalshi also advertised (and then abruptly took down) "Sports Operations" jobs seeking particularly individuals with "extensive experience with sportsbooks – understanding how sportsbooks operate, common market types, settlement procedures, and the edge cases that arise in sports market operations."[30]

54.     But Kalshi does not offer legal sports betting—it offers illegal sports betting.

---

[30] *See* Dan Bernstein, *Kalshi Scrubs 'Sportsbook' From Job Listing*, Sportico (Oct. 30, 2025), https://www.sportico.com/business/sports-betting/2025/kalshi-sportsbook-job-listing-1234875400/.

3384758.1

55.     New York State bans all forms of gambling under the state constitution, except for specifically-enumerated exceptions.[31]

56.     Chapter 59 of the Laws of 2021 amended N.Y. Racing, Pari-Mutuel Wagering and Breeding Law ("PML") section 1367 and added section 1367(a) to authorize mobile sports wagering to licensed companies. Section 1367-a(2)(a) of the PML provides that "[n]o entity shall administer, manage, or otherwise make available a mobile sports wagering platform to persons located in New York state unless licensed with the commission."

57.     "Sports wagering" under New York law is defined as: "wagering on sporting events or any portion thereof, or on the individual performance statistics of athletes participating in a sporting event, or combination of sporting events, by any system or method of wagering, including, but not limited to, in-person communication and electronic communication through internet websites accessed via a mobile device or computer, and mobile device applications; provided however that sports wagers shall include, but are not limited to, single-game bets, teaser bets, parlays, over-under bets, money line, pools, in-game wagering, in-play bets, proposition bets, and straight bets." PML § 1367(x).

58.     Other than wagering allowed under the PML through licensed entities, "[a]ll wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful." N.Y. Gen. Oblig. § 5-401. The statute directed the Gaming Commission to conduct a competitive bidding process to award licenses to not less than two mobile sports wagering platform providers that would host no less than four mobile sports wagering operators.

59.     In December 2021, the Commission awarded licenses for ten years to nine mobile

---

[31] New York State Constitution, Article I, § 9

3384758.1

sports wagering operators at a tax rate of 51 percent. Defendant is not among the nine

operators.[32]

60.     The taxes from these licenses fund the Council on Problem Gambling, which

monitors gambling addiction on the platforms, operates seven problem gambling resource

centers across the state, and hosts events, workshops, and conferences to raise awareness

regarding the risks and signs associated with problem gambling, and provides referrals to help

addicts access appropriate services.[33]

61.     In addition to levying heavy taxes on licensed mobile sports wagering operators,

the law requires operators to implement measures to prohibit minors from participating in sports

wagering activity, and the Commission tracks alleged occasions of underage participation on the

licensed platforms.[34] Additionally, and in recognition that gambling is an addictive and

potentially dangerous behavior, New York State has developed a robust self-exclusion program

for individuals "who recognize that they should no longer participate in legal gambling."[35]

62.     Pursuant to that law, the Commission also collects data and demographic

information from sports wagering participants on legal platforms and those seeking help for

gambling addiction.[36] This information includes:

        a.      Statistics and demographics regarding the number of individuals who

accept problem gambling information upon entering voluntary self-exclusion;

        b.      Statistics and demographics relating to page interactions for individuals

---

[32] N.Y. State Gaming Comm'n & N.Y. State Office of Addiction Servs. & Supports, *Annual Report* 2-3 (Apr. 19, 2023, updated June 29, 2023), https://www.gaming.ny.gov/pdf/06.29.23.MSWImpactReport.pdf.
[33] *Id.* at 6.
[34] *Id*. at 4.
[35] *Id.*
[36] *Id.* at 6-7.

who visit sports wagering licensees' problem gambling web pages;

      c.    Statistics and demographics of sports wagering participants who, upon annual notification of hitting the statutory deposit limit, opt to take a "break" or acknowledge the limit and continue play;

      d.    Gathering information about trends in gambling disorders;

      e.    Providing training specific to mobile sports betting for counselors including training on engaging family members; and

      f.    Identifying specific geographic regions or vulnerable populations in need of services and developing programming to address those specific needs.

63.    Consumers on Kalshi stake or risk "something of value upon the outcome of a contest of chance or a future contingent event not under [their] control or influence, upon an agreement or understanding that [they] will receive something of value in the event of a certain outcome," in violation of Racing Law § 1367(1)(t).

64.    According to Racing Law § 1367-(a)(4)(b), "No entity shall directly or indirectly operate an unlicensed sports wagering platform in the state of New York, or advertise or promote such unlicensed platform to persons located in the state of New York." Kalshi is operating an unlicensed sports wagering platform in New York, and advertising its unlicensed platform.

65.    New York law further states, "A person placing a wager shall be at least twenty-one years of age." PML § 1367(2)(d). Kalshi allows "minors" (any person under age 21, PML § 1367(j)) to wager on its platform.

66.    And New York law prohibits wagering on "a sport or athletic event in which any New York college team participates regardless of where the event takes place." PML § 1367(s). Kalshi offers bets on "prohibited sports events" to consumers. *Id.*

67.     Kalshi is operating a sports wagering enterprise in violation of New York law. It is operating illegally, avoiding the robust taxes that New York levies on legally operating companies and sidestepping the tightly-regulated environment that allows the state to monitor legalized gambling, identify problematic behavior, and act appropriately to ensure the legalized gambling experience is consistent with the values of the State of New York.

### III.    Kalshi dupes consumers into thinking they are legally gambling against other consumers, when they are actually gambling against the House.

68.     Unregulated sports betting (of any kind) is illegal in New York. In sports betting, consumers gamble against a bookmaker ("the House") on performance statistics of athletes or teams participating in a sporting event. The House sets betting lines, and consumers bet on either side of the House lines. The House tends to be highly sophisticated, and aims to set accurate odds that give it the best chance of making money. The House also charges Vigorish ("the Vig"), which is a fee charged for accepting a wager. In other words, sports books pay out less for a winning bet than they take for a losing bet. The Vig and the sophistication of house betting lines make it very difficult for consumers to make long-term profits from sports betting.

69.     Kalshi seeks to make money in two ways: by taking Vig (that it calls "fees") on every bet placed by consumers, and by betting against consumers.

70.     Even if consumers were betting only against consumers on sports, Kalshi operates a mobile sports wagering platform in violation of New York law, and illegally collects money from individuals placing sports wagers. *See infra* IV.

71.     The wagers available to Kalshi's consumers are indistinguishable from those offered in casinos, sportsbooks, and other gambling establishments. A side-by-side comparison between FanDuel, a sportsbook, and Kalshi shows both offering identical bets on football games (FanDuel is on the left, Kalshi on the right). Both offer bets on with a baseline "spread" of Dallas

winning by 2.5 points, and a baseline over/under of 47.5 total points. This is because Kalshi, like most sportsbooks, sets betting lines.



72.      A betting line is the baseline projected result for a sporting event. The sportsbook allows consumers to pick either side of the betting line. For example, if the Dallas Cowboys are listed as -2.5, and someone bets on them, they would get paid out if the Cowboys win by 3 or more points. The -110 odds show the payouts for a successful bet, factoring in the Vig. So, a $100 bet on one side, if correct, would pay out $190.91 ($90.91 profit), but a loss would cost the full $100.

73.      If consumers bet equally on either side of a House line, the House profits by taking the Vig. Therefore, by setting a neutral betting line in the consumer market, the House profits with minimal to no risk because consumers allocate themselves on either side of the line. If consumers disproportionately bet on one side of the House line, either the House moves the line, or the House shoulders additional risk against consumers. Sportsbooks employ highly sophisticated research teams to set optimal betting lines based on an understanding of the consumer market, not just the sporting events themselves.[37]

74.      Kalshi operates the same way: it uses its internal market maker and partners to set a betting line based projections of the consumer market (and its lines are usually identical to

---

[37] *See* Patrick Cwiklinski, *How Do Bookmakers Determine Sports Odds?*, SportsBettingDime (June 10, 2025), https://www.sportsbettingdime.com/guides/betting-101/how-bookmakers-generate-odds/.

other casino and sportsbook betting lines), and then Kalshi profits off of the Vig ("fees") if consumers evenly allocate themselves on either side of the line.

75.    But Kalshi's egregious violation of New York law goes further still. Consumers on Kalshi do not only bet against each other—they also bet against Kalshi. Kalshi engages in House betting through "market makers," which set betting lines, and gamble against the consumer.

76.    Defendant Kalshi Trading LLC, a wholly owned subsidiary of Kalshi, operates as a highly sophisticated profit-seeking "market maker." It sets betting lines, and can also bet against consumers on either side of the bet when their bets stray from Kalshi's internal projected odds.[38] A Kalshi representative called Kalshi Trading "one of many 'peers' in the peer-to-peer ecosystem."[39] Kalshi Trading is not a peer; it is part of the House.

77.    Upon information and belief, Kalshi's co-founders coordinate directly with Kalshi Trading to set betting lines and provide liquidity to markets.

78.    Kalshi also partners with hedge funds, such as Susquehanna International Group, to provide a "market making" service for Kalshi.[40]

79.    Kalshi operates using a model functionally indistinguishable from House betting in other illegal sportsbooks that the law expressly prohibits. While consumers may bet on either side of the House baseline in any sportsbook, the House sets the betting line, and profits from fees on consumers' bets. Kalshi's market makers set the baseline.

---

[38] *See* Marc Novicoff, *The Company Making a Mockery of State Gambling Bans*, *supra* note 1.
[39] *See* Dan Bernstein and Eben Novy-Williams, *Kalshi's Trading Arm Muddles 'Peer-to-Peer' Claims*, Sportico (Sept. 11, 2025), https://www.sportico.com/business/sports-betting/2025/kalshi-trading-exchange-peer-house-1234870465/
[40] *See* Marc Novicoff, *The Company Making a Mockery of State Gambling Bans*, *supra* note 1.

80.     To maximize returns, market makers employ dedicated research teams, proprietary statistical models, and superior data and software. Additionally, market makers benefit from their unique contractual and technological integration with prediction markets, which provide them with financial benefits, reduced (or zero) fees, differing position limits, and enhanced access. These advantages greatly reduce market makers' financial exposure. As a result, individual consumers hardly stand a chance, all the while thinking they are just betting against other regular consumers.

81.     Kalshi's "combo" (parlay) bets further increase the wins for the House.[41] Parlays traditionally produce the highest House return ("hold") in sports betting. Whereas straight bets produce a hold of approximately 5%, parlay betting can produce holds of up to 30%.[42] By offering consumers parlays against the House, Kalshi dramatically increases its hold through illegal sports gambling. Kalshi's parlays require multiple correct bets to win a large payout, but if any bet is wrong, consumers lose. An example of Kalshi's parlay feature is below:[43]

---

[41] *See* Dan Bernstein, *Kalshi's Parlays Bring Limitations, Losses to Most Retail Bettors*, Sportico (Nov. 19, 2025), https://www.sportico.com/business/sports-betting/2025/kalshi-parlay-combo-rfq-explainer-1234877038/.

[42] *See* Jeffrey McMillan, *Kalshi Adds Parlays in Milestone Sports Shift*, PokerScout (Sep. 30, 2025), https://www.pokerscout.com/kalshi-adds-parlays-milestone-sports-shift/.

[43] Dustin Gouker, *The Closing Bell: How Big Was Kalshi's Second Attempt At Parlays?*, Event Horizon (Oct. 3, 2025), https://nexteventhorizon.substack.com/p/the-closing-bell-how-big-was-kalshis.



82.    Kalshi's "combo" bets involve exponential growth, and require winning every bet placed in order to pay out.

83.    For its "combo" bets, contrary to Kalshi's public representations, the supposed peers on the other side of a "combo" are Kalshi's in-house trading firm (Kalshi Trading) and the large institutional funds that partner with Kalshi.[44] When someone places a "combo" bet, the request is sent out to Kalshi Trading and Kalshi's approved market makers through a method called Request for Quote (RFQ).[45] When a Kalshi consumer places a parlay bet, market makers offer lines through an anonymous bidding system within milliseconds through a back-end infrastructure uniquely accessible to market makers in the company's app.[46]

84.    Kalshi advertises that anyone can be an RFQ market maker. But practically, being on the other side of parlays requires approved access to Kalshi's back-end infrastructure, an in-

---

[44] *See* Dan Bernstein, *Kalshi's Parlays Bring Limitations, Losses to Most Retail Bettors*, *supra* note 41.

[45] *Id.*

[46] *Id.*

depth understanding of Kalshi's API trading technology, an understanding of python code, software able to automatically quote prices in a split second.[47] In other words, the RFQ system matches "retail" consumers with the institutional market makers. This, again, ends up functionally the same as any other parlay at any other sportsbook.

85.     Based on data presented by former Kalshi employee Adhi Rajaprabhakaran, the consumers are losing their parlays against the "makers."



86.     On December 15, 2025, co-founder Mansour posted that Kalshi had over $100 million in "combo" bets in the past week.

47 *Id.*



87.     Despite trying to avoid the word, "combos" are parlays. Kalshi's employees and sponsored accounts refer to "combos" as parlays. Kalshi's "Head of Crypto" John Wang posted "let it rip" with a screenshot of a bet that says "**Parlay**" in the top left corner.



-28-

88.     Kalshi-sponsored account "LakeShowYo" similarly posted "No way they got parlays now lmaooo."



89.     The volume of Kalshi's parlays has grown significantly in November and December 2025 (with spikes around every football game). The graph from Twitter account @datadashboards shows the growth.



90.      Kalshi advertises that it has "no house." For example, the page for Kalshi Sports states, "**No house, no limits**." And its description says "Trade every sport in all 50 states with no house."



91.      Co-founder Tarek Monsour stated to the New York Times, "Kalshi doesn't win when our customers lose, which creates a fair, transparent environment for people to trade."[48] He similarly stated for "combos" that "there is no house." *Supra* ¶ 86.

92.      But Kalshi's business model is that it *does* win when its customers lose.

93.      Consumers do not realize they are actually being tricked into sports betting against Kalshi. When consumers place bets on Kalshi, they face off against money provided by a

---

[48] *See* Ben Blatt and Amy Fan, *Is Sports Betting Illegal in Your State? Not if You Call It a 'Prediction Market.' Supra* note 2.

sophisticated market maker on the other side of the ledger. Market makers make it possible for consumers to place illegal, unregulated wagers "against the House."

**IV.    Even if consumers were only gambling directly against other consumers, Kalshi would still be profiting off of them by operating an illegal sportsbook.**

94.     Kalshi bills itself as a "peer-to-peer" market, and claims that this distinguishes it from a sportsbook.[49] Its official Reddit account posted the following argument about election betting:

> **kalshi_official OP** replied to **FuriousResolve** 9 mo. ago
>
> The first big difference is that we're a free market, not a book. We don't set the odds, we open a market and let people trade on it, and where the market settles is what the odds are. This is important because it means we're not profiting off of people from vig. In fact, we've waived all fees on election markets!
>
> Second, the market's opinion is really accurate. It's useful to the public to have a gauge of what the chances of a particular event happening are, particularly with massively consequential events like elections. Sportsbooks are a business, but we're a business and a public good.
>
> ⬆ -19 ⬇    ⤨ Share    ⋯

95.     But the vast majority of Kalshi's volume and revenue comes from unlicensed sports gambling.

96.     Kalshi's fee structure allows it to profit more from sports betting than its other offerings. In recent months, 95% of Kalshi's "fees" have come from sports, due to its sports wagering having higher average fees for Kalshi, and much faster resolutions than other "markets."[50]

97.     Operating an unlicensed sports gambling platform for consumers to exchange bets, and taking a fee (sometimes called "Vig," "commission," or "rake") would also be illegal.

---

[49] *See* Dan Bernstein, *Kalshi Says Its 'Odds' Hats and 'Bet' Ads Don't Make It a Gambling App*, Sportico (July 15, 2025), https://www.sportico.com/business/sports-betting/2025/kalshi-odds-merch-store-prediction-market-1234861780/.

[50] *See* Sam Learner, *Prediction markets barely make money; sportsbooks make money*, Financial Times (Dec. 19, 2025), https://www.ft.com/content/1ac03f57-bd5d-4196-85ff-4bd96dc69e0d.

98.    A bookmaker can run a sportsbook through "exchange" or "pool" betting, where consumers' bets are matched with an opposing bet, and the House profits by taking money out of the payouts.

99.    Nothing requires the House to be a direct participant in its gambling operation. For example, in poker, players play against each other, and the House collects a "rake" out of each player's buy-ins or winnings.[51] The annual Circa Survivor sports betting contest also involves consumers competing against one another while the House takes a commission.[52] These contests would be illegal without a gaming license.

100.    N.Y. General Obligation law § 5-401, refers to "Illegal wagers, bets and stakes," and states: "All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."

101.    Under New York law, "Sports wagering" means "wagering on sporting events or any portion thereof," which includes, but is not limited to "single-game bets, teaser bets, parlays, over-under bets, money line, pools, in-game wagering, in-play bets, proposition bets, and straight bets." Racing Law § 1367(1)(x).

102.    Related to sports wagering, "Sports pool" means "the business of accepting wagers on any sports event by any system or method of wagering." *Id.*

---

[51] *See* Jon Sofen, *What does rake mean in poker?*, Poker.org (July 14, 2021), https://www.poker.org/poker-strategy/poker-for-beginners/what-does-rake-mean-in-poker-aYPti7d1oOp8/ ("In all U.S. states, it is illegal for an unlicensed casino to charge rake in a poker game.").
[52] *See* Ben Fawkes, *Circa Sports has $18.7M guaranteed survivor prize pool, the largest legal sports betting contest in U.S. history*, Yahoo Sports (Sep. 7, 2025), https://sports.yahoo.com/nfl/betting/article/circa-sports-has-187m-guaranteed-survivor-prize-pool-the-largest-legal-sports-betting-contest-in-us-history-125825068.html.

-32-

103.    Kalshi operates an illegal sports wagering platform, offering single-game sports bets, parlays, over-under bets, money line bets, in-game wagering, proposition bets, and straight bets. The definitions of "sports wagering" and "sports pool" apply to "any system or method of wagering," including taking a commission and pairing bets from either side of a betting line. *Id.*

104.    Only a licensed operator may operate a sports pool, or accept sports wagers, upon approval and licensing by the New York State Gaming Commission (NYSGC). Racing Law § 1367 specifies: "No entity shall directly or indirectly operate an unlicensed sports wagering platform in the state of New York." Racing Law § 1367-a(4)(b).

105.    Further, "Bookmaking" means "advancing gambling activity by unlawfully accepting bets from members of the public as a business, rather than in a casual or personal fashion, upon the outcomes of future contingent events." Under N.Y. Penal Law § 225.00(9).

106.    Regardless of whether Kalshi bets directly or indirectly against consumers (which it does, *supra* III), it acts as a bookmaker and an unlicensed sports operator by running a gambling platform, and accepting bets. Even if Kalshi were just a platform for exchange betting, it would be an illegal sports betting platform.

107.    Because Kalshi serves as a counterparty, shouldering the credit risk of all bets, and serving as its own market maker (facing off against consumers in the process), Kalshi and its partners are gambling "winners" at the expense of the consumer.

**V.     Illegal gambling is addictive and dangerous, especially when consumers do not have proper safeguards.**

108.    An October 2025 Kalshi commercial marketed its product as "[s]imple, regulated, and kind of addicting."[53] While it is not regulated or simple, it is addicting.

---

[53] *See* Dustin Gouker, *Kalshi Says It's 'Kind Of Addicting' In Instagram Post*, Event Horizon (Oct. 21, 2025), https://nexteventhorizon.substack.com/p/kalshi-says-its-its-kind-of-addicting.

109.    As detailed below, Kalshi enables addictive gambling behavior by underage adults, problem gamblers, and others by enticing them to gamble with "free" money while ensuring them that they are legally gambling against peers.

110.    For example, Kalshi runs advertisements through sponsored influencers. One advertisement, through the sports betting publication, Covers, consumers are faced with offers that their deposits will receive a $10 bonus. In other words, consumers are enticed to join the platform because they will be receiving bonus funds.



111.    Kalshi ran similar advertisements by sponsoring professional gambler Daniel Negreanu (aka "Kid Poker"), who offers anyone signing up "$40 for free" when they put "100 in action," as well as the potential to win a $30,000 trip to the Bahamas.



112.    Kalshi has sponsored a variety of influencers, including a **15-year-old** gaming

influencer.



-35-



113.    On September 19, 2025, Kalshi also announced that it was targeting college campuses. Kalshi publicly announced that it was partnering with college clubs as part of "KalshiU" to bring in "the next 100M users."



114.    At no point in the sign-up process does Kalshi inform consumers that they will be gambling against Kalshi (and does not mention that they will be gambling at all).

3384758.1



115.    Thus, Kalshi lures consumers onto "prediction" platforms, offering to match their contributions or provide "free" money upon a consumer signing up. Once signed up, consumers gamble without limits or guardrails against institutional investors with inside access while being charged a high Vig.

116.    Research on gambling addiction has demonstrated the grave problems that arise for individuals participating in sports betting, including addiction, and suicidal ideation.[54]

117.    By stimulating the brain's reward system, gambling can lead to addiction and cause participants to risk valuable assets—*e.g.* money—in hopes of getting something of even greater value.[55]

---

[54] *See An Explosion in Sports Betting Is Driving Gambling Addiction Among College Students*, The Ohio State University College of Social Work (Dec. 20, 2023), https://csw.osu.edu/blog/2023/12/20/an-explosion-in-sports-betting-is-driving-gambling-addiction-among-college-students/.
[55] *See* Emily Sohn, *How gambling affects the brain and who is most vulnerable to addiction*, Monitor on Psych., July/August 2023, at 62, https://www.apa.org/monitor/2023/07/how-gambling-affects-the-brain.

118.     Furthermore, parlays are especially popular with younger members of the sports betting community.[56] The minimum age to gamble on Kalshi's platform is 18.[57]

119.     Unregulated sportsbooks also risk the integrity of sports games. While regulated sportsbooks can monitor suspicious bets, there are not sufficient safeguards against players (directly or through proxies) placing bets through Kalshi, especially if Kalshi pretends to offer something other than gambling.[58] Recent betting scandals, such as the indictment of NBA player Terry Rozier for allegedly purposefully leaving a game early and tipping off co-conspirators to bet the "under" on his performance metrics, were detected through regulated sportsbooks.[59]

120.     On December 17, 2025, Kalshi "self certified" college sports prediction markets for consumers (and Kalshi) to bet on whether student athletes transfer schools.[60] NCAA President Charlie Baker stated in response: "The NCAA vehemently opposes college sports prediction markets. It is already bad enough that student-athletes face harassment and abuse for lost bets on game performance, and now Kalshi wants to offer bets on their transfer decisions and status. This is absolutely unacceptable and would place even greater pressure on student-

---

[56]  *See* Emily Giambalvo, Kati Perry, and Aaron Steckelberg, *Americans can't stop betting parlays. Sportsbooks are cashing in*, Washington Post (Oct. 9, 2025), https://www.washingtonpost.com/sports/interactive/2025/parlay-popularity-odds-sportsbooks/ ("Parlays are particularly popular among young people. Standard parlays accounted for 82 percent of all wagers for bettors age 21 to 24 in New Jersey for 2020, the most recent year that data is available.").

[57] *Signing Up as an Individual*, Kalshi, https://help.kalshi.com/account/signing-up/signing-up-as-an-individual ("Be 18 years or older").

[58] *See* Ira Boudway, *Kalshi and Other Prediction Markets Should Scare Sports Leagues*, Bloomberg (Dec. 16, 2025), https://news.bloomberglaw.com/business-and-practice/kalshi-and-other-prediction-markets-should-scare-sports-leagues.

[59] *Id.*

[60] *See* David Purdum, *Prediction market Kalshi self-certifies transfer portal trading*, ESPN (Dec. 17, 2025), https://www.espn.com/college-football/story/_/id/47341610/prediction-market-kalshi-intends-offer-trading-portal.

athletes while threatening competition integrity and recruiting processes."[61] Baker added, "Their decisions and future should not be gambled with, especially in an unregulated marketplace that does not follow any rules of legitimate sports betting operators."[62]

121.    Market manipulation and insider betting have already been significant issues on Kalshi's platform. For example, in October 2025, Coinbase CEO Brian Armstrong decided to publicly list off a series of words at the end of his earnings call ("Bitcoin, Ethereum, blockchain, staking, and Web3") because there were prediction markets betting on which words he would say.[63]

122.    Thus, Kalshi makes unlawful gambling widely available to the public through its online and mobile platforms, presenting broader swaths of the population with the attendant risks of gambling without any of the safeguards. The risk is particularly damaging as the average age of the population participating in these unlawful games skews younger, and as large sums of money are bet on sports games.[64]

## VI.    States are cracking down on unlawful sports betting.

123.    As discussed above, states are beginning to crack down on these unlawful sports-betting operations. Arizona, Connecticut, Illinois, Maryland, Montana, Nevada, New Jersey, New York, and Ohio sent cease-and-desist letters ordering Kalshi to cease and desist offering

---

[61] *Id.*

[62] *Id.*

[63] *See* Emily Nicolle and Justina Lee, *Coinbase CEO Stunt Exposes Prediction Market Vulnerability*, Bloomberg (Oct. 31, 2025), https://news.bloomberglaw.com/crypto/coinbase-ceo-stunt-exposes-vulnerability-in-prediction-markets.

[64] *See* David Purdum, *Sports betting prevalent among young adults, survey says*, ESPN (May 24, 2023), https://www.espn.com/sports-betting/story/_/id/37721222/sports-betting-prevalent-young-adults-survey-says

illegal sports betting under the guise of prediction markets. The Massachusetts Attorney General

similarly concluded Kalshi's "event contracts" are illegal sports betting, and brought a lawsuit.[65]

124.    Additionally, in October 2023, the New York Gaming Commission adopted New

York Rule 5602.1(a)(4), which explicitly outlaws this kind of "proposition betting," or bets made

regarding the occurrence or non-occurrence during a game of an event not directly affecting the

game's final outcome. That regulation states that "[c]ontests shall not be based on proposition

betting or contests that have the effect of mimicking proposition betting. Contests in which a

contestant must choose, directly or indirectly, whether an individual athlete or a single team will

surpass an identified statistical achievement, such as points scored, are prohibited."[66]

125.    Plaintiffs welcome the crackdown, but it does not make them, or members of the

putative class, whole. They seek the value of the money they paid into Kalshi's illegal gambling

platforms.

## CLASS ALLEGATIONS

126.    **Class Definition:** Pursuant to the provisions of Fed. R. Civ. P. 23(a), 23(b)(2),

and (b)(3), Plaintiffs bring this action on behalf of themselves, a Nationwide Class and Statewide

Classes (collectively, "the Class"), defined as follows:

> All persons in the United States who spent money by wagering on Kalshi's mobile
> or web platforms.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over

this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents,

successors, predecessors, and any entity in which Defendant or its parents have a controlling

---

[65] *AG Campbell Sues Online Prediction Market for Illegal and Unsafe Sports Wagering Operations*, Office of the Attorney General, https://www.mass.gov/news/ag-campbell-sues-online-prediction-market-for-illegal-and-unsafe-sports-wagering-operations.
[66] *Id.*

interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

127.    In addition to the Nationwide Class, and pursuant to Federal Rules of Civil Procedure 23(c)(5), Plaintiffs seek to represent the following State Classes or subclasses as well as any subclasses or issue classes as Plaintiffs may propose and/or the Court may designate at the time of class certification:

**New York State Class:** All persons in New York who spent money by wagering on Kalshi's mobile or web platforms.

**Alabama Class:** All persons in Alabama who spent money by wagering on Kalshi's mobile or web platforms.

**Arkansas Class:** All persons in Arkansas who spent money by wagering on Kalshi's mobile or web platforms.

**California Class:** All persons in California who spent money by wagering on Kalshi's mobile or web platforms.

**Connecticut Class:** All persons in Connecticut who spent money by wagering on Kalshi's mobile or web platforms.

**District of Columbia Class:** All persons in the District of Columbia who spent money by wagering on Kalshi's mobile or web platforms.

**Florida Class:** All persons in Florida who spent money by wagering on Kalshi's mobile or web platforms.

3384758.1

**Georgia Class:** All persons in Georgia who spent money by wagering on Kalshi's mobile or web platforms.

**Illinois Class:** All persons in Illinois who spent money by wagering on Kalshi's mobile or web platforms.

**Indiana Class:** All persons in Indiana who spent money by wagering on Kalshi's mobile or web platforms.

**Kentucky Class:** All persons in Kentucky who spent money by wagering on Kalshi's mobile or web platforms.

**Maryland Class:** All persons in Maryland who spent money by wagering on Kalshi's mobile or web platforms.

**Massachusetts Class:** All persons in Massachusetts who spent money by wagering on Kalshi's mobile or web platforms.

**Michigan Class:** All persons in Michigan who spent money by wagering on Kalshi's mobile or web platforms.

**Minnesota Class:** All persons in Minnesota who spent money by wagering on Kalshi's mobile or web platforms.

**Mississippi Class:** All persons in Mississippi who spent money by wagering on Kalshi's mobile or web platforms.

**Missouri Class:** All persons in Missouri who spent money by wagering on Kalshi's mobile or web platforms.

**Montana Class:** All persons in Montana who spent money by wagering on Kalshi's mobile or web platforms.

3384758.1

**New Hampshire Class:** All persons in New Hampshire who spent money by wagering on Kalshi's mobile or web platforms.

**New Jersey Class:** All persons in New Jersey who spent money by wagering on Kalshi's mobile or web platforms.

**New Mexico Class:** All persons in New Mexico who spent money by wagering on Kalshi's mobile or web platforms.

**Ohio Class:** All persons in Ohio who spent money by wagering on Kalshi's mobile or web platforms.

**Oregon Class:** All persons in Oregon who spent money by wagering on Kalshi's mobile or web platforms.

**South Carolina Class:** All persons in South Carolina who spent money by wagering on Kalshi's mobile or web platforms.

**South Dakota Class:** All persons in South Dakota who spent money by wagering on Kalshi's mobile or web platforms.

**Tennessee Class:** All persons in Connecticut who spent money by wagering on Kalshi's mobile or web platforms.

**Vermont Class:** All persons in Vermont who spent money by wagering on Kalshi's mobile or web platforms.

**Virginia Class:** All persons in Virginia who spent money by wagering on Kalshi's mobile or web platforms.

**Washington Class:** All persons in Washington who spent money by wagering on Kalshi's mobile or web platforms.

3384758.1

**West Virginia Class:** All persons in West Virginia who spent money by wagering on Kalshi's mobile or web platforms.

**Wisconsin Class:** All persons in Wisconsin who spent money by wagering on Kalshi's mobile or web platforms.

128.    **Numerosity:** On information and belief, thousands of consumers fall into the definition of the Class. Members of the Class can be identified through Defendant's records, discovery, and other third-party sources.

129.    **Commonality and Predominance:** There are many questions of law and fact common to Plaintiffs' and the Class's claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

      a.    Whether Kalshi's sports markets are unlawful under section 1400-12 of the New York Racing, Pari-Mutuel Wagering and Breeding Law;

      b.    Whether Plaintiffs and each member of the Class lost money or anything of value on Kalshi;

      c.    Whether Defendant violated sections 5-419 and -521 of the New York General Obligation Laws;

      d.    Whether Defendant violated section 349 of New York's General Business Law; and

      e.    Whether Defendant has been unjustly enriched as a result of its conduct.

130.    **Typicality:** Plaintiffs' claims are typical of the claims of other members of the Class in that Plaintiffs and the members of the Class sustained damages arising out of Defendant's wrongful conduct.

3384758.1

131.    **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class, as Plaintiffs and each member of the Class lost money playing Defendant's games of chance. Plaintiffs also have no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

132.    **Policies Generally Applicable to the Class:** This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies that Plaintiffs challenge apply and affect members of the Class uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs. The factual and legal bases of Defendant's liability to Plaintiffs and to the other members of the Class are the same.

133.    **Superiority:** This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be difficult if not impossible for the individual members of the Class to obtain effective relief from Defendant. Even if members

of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

134.    Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## **CLAIMS FOR RELIEF**

**I.    CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE CLASS**

### **NATIONWIDE COUNT I**
**N.Y. GEN. OBLIG. LAW § 5-419**
**Plaintiffs Against All Defendants**

135.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if fully set forth herein.

136.    Section 5-419 of the New York General Obligations Law states that, "[a]ny person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not."

137.    Plaintiffs deposited money into accounts created and owned by Defendant for the purpose of engaging in unlawful betting and/or wagering.

138.    Defendant was engaged in an unlawful enterprise wherein consumers paid to

participate in unlawful betting and/or wagering.

139.    Upon information and belief, Defendant operated its enterprise out of New York. Defendant processed online consumer payments in New York. Defendant's user agreements include a New York choice-of-law clause.

140.    Pursuant to § 5-419, Plaintiffs and the Class have a right to recover from Defendant the monies deposited as part of Defendant's unlawful betting and/or wagering enterprise.

## NATIONWIDE COUNT II
### N.Y. GEN. OBLIG. LAW § 5-421
### Plaintiffs Against All Defendants

141.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if fully set forth herein.

142.    Section 5-421 of the New York General Obligations Law states that, "[e]very person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

143.    Within the past three months, Plaintiffs deposited at least twenty-five dollars into accounts created and owned by Defendant for the purpose of engaging in unlawful betting and/or wagering.

144.    Plaintiffs lost the money they deposited by engaging in Defendant's unlawful betting and/or wagering games.

**NATIONWIDE COUNT III**
**N.Y. GEN. BUS. LAW § 349**
**Plaintiffs Against All Defendants**

145.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if fully set forth herein.

146.    New York General Business Law section 349 establishes that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

147.    New York General Business Law section 349 applies to Defendant because Defendant engages in consumer conduct by, *inter alia*:

a.    Providing an online platform wherein consumers pay to participate in illegal wagering and betting;

b.    employing individuals in furtherance of its business;

c.    soliciting individuals to become consumers of its product; and

d.    Obtaining consumers' money in furtherance of its business.

148.    Defendant violated section 349 by, *inter alia*, misrepresenting the sports betting they offer as "legal sports betting," when it is unlicensed, by misrepresenting its products as "peer-to-peer" when consumers are actually betting against Kalshi's internal market makers and partners, and telling consumers that they are "investing" or "trading" when they are actually gambling.

149.    Defendant's conduct was material because it was likely to deceive reasonable consumers about the probability of winning their bets, the lawfulness of its business and services offered, and whether they were engaged in an addictive behavior.

150.    Defendant willfully misled Plaintiffs and Class members and induced them to rely on their misleading statements and/or omissions.

3384758.1

151.    Defendant accepted money from Plaintiffs and the Class members to participate in unlawful wagering or betting.

152.    Accordingly, Plaintiffs and Class members acted reasonably in relying on Defendant's misleading statements and/or omissions, the truth of which they could not have discovered through reasonable investigation.

153.    Defendant acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiffs' and Class members' rights.

154.    As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiffs and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

155.    Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law.

### NATIONWIDE COUNT IV
### UNJUST ENRICHMENT
### Plaintiffs Against All Defendants

156.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if fully set forth herein.

157.    Plaintiffs and Class Members conferred benefit upon Defendant by paying Defendant to participate in their unlawful betting and wagering scheme.

158.    Defendant appreciated or had knowledge of the benefits they received from Plaintiff and Class members.

159.    Plaintiffs and Class members reasonably understood that Defendant offered lawful consumer-to-consumer markets under New York state law.

160.    Defendants enriched themselves by saving the costs they reasonably should have expended on complying with regulations and tax requirements for offering betting and wagering

3384758.1

services that were not properly advertised or permitted by law.

161.    Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' benefits conferred.

162.    Plaintiffs and Class members have no adequate remedy at law.

163.    Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

## II.    STATE SPECIFIC CLAIMS

<u>CALIFORNIA COUNT I</u>
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL")**
**(on behalf of Plaintiffs Crystal Pelayo, Christopher Mai, and the California Class)**
**Plaintiffs Against All Defendants**

164.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if fully set forth herein.

165.    Kalshi and Plaintiffs are "persons" within the meaning of the California UCL.

166.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

167.    Kalshi has violated the UCL's proscription against engaging in "unlawful" conduct by virtue of its violations of, inter alia, the following laws:

        a.    California's Gambling Control Act (Cal. Bus. & Prof. Code §§ 19800, et seq.): Sections 19801 and 19850 of the Gambling Control Act provide that unless licensed, state law prohibits commercially operated gambling facilities; that no new gambling establishment may be opened except upon affirmative vote of the electors; that all gambling operations and persons having significant involvement therein shall be licensed, registered, and regulated; and that all persons who deal, operate, carry on, conduct, maintain or expose for play any gambling

-50-

game shall apply for and obtain a valid state gambling license. Kalshi has not applied for or obtained any state gambling license, and therefore violates California's Gambling Control Act. As the California legislature reaffirmed in 2008, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

        b.    California Penal Code Section 330, which provides in relevant part that "[e]very person who . . . conducts, either as owner or employee . . . any banking or percentage game played with . . . any device, for money, checks, credit, or other representative of value . . . is guilty of a misdemeanor." CAL. PENAL CODE § 330. A "banking game" refers to a situation where the "House" is a participant in the game, taking on all contestants, paying all winners, and collecting from all losers. *See Sullivan v. Fox*, 189 Cal. App. 3d 673, 678 (1987). And a "percentage game" refers to a situation where the house collects a portion of the bets or wagers made by contestants, but is not directly involved in game play. *See id.* at 679. Kalshi operates both illegal banking games when it trades as the House through its market makers and illegal percentage games when it takes fees on bets made by consumers.

        c.    California Penal Code Section 337a, which prohibits additional conduct, including: i) "Pool selling or bookmaking, with or without writing, at any time or place." CAL. PENAL CODE § 337a(a)(1); ii) "[R]eceiv[ing], hold[ing], or forward[ing] . . . in any manner whatsoever, any money . . . staked, pledged, bet or wagered, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event

whatsoever." *Id.* at (a)(3). "[A]t any time or place, record[ing], or register[ing] any bet or bets, wager or wagers, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever." *Id.* at (a)(4). Kalshi acts as a bookmaker, and accepts pooled bets on the results of sports events.

        d.      California Penal Code § 337j(a)(2): Kalshi violates Cal. Penal Code § 337j(a)(2) by "receiv[ing], directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game." Kalshi directly receives compensation by taking a share of consumers' bets.

168.    Kalshi has, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into believing the operation of its gambling website is lawful in California, when it is not, and has further tricked consumers into believing they are not gambling against the House, causing Plaintiffs to be tricked out of millions of dollars.

169.    Plaintiffs and the Class have a right to recover from Kalshi the monies deposited as part of Kalshi's unlawful betting and/or wagering enterprise.

**FLORIDA COUNT I**
**CLAIM UNDER FLORIDA GAMBLING LAWS**
**Fla. Stat. §§ 849.12, 849.26, 849.29**
**(on behalf of Plaintiffs Jacob Tingle, Reshawna Jones, and the Florida Class).**
**Plaintiffs Against All Defendants**

170.    Plaintiffs bring this count against all Defendants under Fla. Stat. §§ 849.12, 849.26, and 849.29.

171.    Fla. Stat. § 849.12 ("Money and prizes to be forfeited") states, in part: "All sums of money and every other valuable thing drawn and won as a prize, or as a share of a prize, or as

-52-

a share, percentage or profit of the principal promoter or operator…used or displayed in or in connection with any illegal gambling or any illegal gambling device contrary to the laws of this state, shall be forfeited, and may be recovered by civil proceedings."

172.     Plaintiffs bring this civil proceeding to recover money wagered in connection with Kalshi's illegal gambling operation, within the definitions of Fla. Stat. § 849.12.

173.     Fla. Stat. §§ 849.26 ("Gambling contracts declared void") and 849.29 ("Persons against whom suits may be brought to recover on gambling contracts") collectively state that illegal gambling contracts are void, and that suit to recover losses may be brought against any or all of: "The winner of the money or property lost in the gambling transaction; every person who, having direct or indirect charge, control or management, either exclusively or with others, of the place where the gambling transaction occurs, procures, suffers or permits such place to be used for gambling purposes; whoever promotes, sets up or conducts the gambling transaction in which the loss occurs or has an interest in it as backer, vendor, owner or otherwise; and, as to anything of value other than money, the transferees and assignees, with notice, of the persons hereinabove specified in this section."

174.     Upon information and belief, thousands of individuals within Florida have lost— and continue to lose—money by playing at games of chance (i.e., gambling) with Kalshi.

175.     Defendants are "winners" of money or property in illegal gambling transactions, and also "control," "manage," "promote," and "set up" gambling transactions in which the losses occur, within the definitions of Fla. Stat. §§ 849.26 and 849.29.

176.     Plaintiffs and the Class have a right to recover from Kalshi the monies deposited as part of Kalshi's unlawful betting and/or wagering enterprise.

**NEW MEXICO COUNT I**
**CLAIM UNDER N.M. STAT. ANN. § 44-5-1**

**(on behalf of Plaintiff Isaiah Esquibel and the New Mexico Class).**
**Plaintiffs Against All Defendants**

177.    Plaintiffs bring this count against all Defendants under N.M. Stat. Ann. § 44-5-1.

178.    N.M. Stat. Ann. § 44-5-1 states, "Any person who shall lose any money or property at any game at cards, or at any gambling device, may recover the same by action of debt, if money; if property, by action of trover, replevin or detinue."

179.    Upon information and belief, thousands of individuals within New Mexico have lost—and continue to lose—money by playing at games of chance (i.e., gambling) with Kalshi.

180.    Each Plaintiff qualifies as a "[p]erson" authorized to sue for the recovery of losses at gaming within the meaning of N.M. Stat. Ann. § 44-5-1.

181.    Plaintiffs and the Class have a right to recover from Kalshi the monies deposited as part of Kalshi's unlawful betting and/or wagering enterprise.

## GEORGIA COUNT I
### CLAIM UNDER O.C.G.A. § 13-8-3
**(on behalf of Plaintiff William Bridges and the Georgia Class).**
**Plaintiffs Against All Defendants**

182.    Plaintiffs bring this count against all Defendants under O.C.G.A. § 13-8-3.

183.    O.C.G.A. § 13-8-3(a) states, "Gambling contracts are void; and all evidences of debt, except negotiable instruments in the hands of holders in due course or encumbrances or liens on property, executed upon a gambling consideration, are void in the hands of any person."

184.     O.C.G.A. § 13-8-3(b) states, "Money paid or property delivered upon a gambling consideration may be recovered from the winner by the loser by institution of an action for the same within six months after the loss and, after the expiration of that time, by institution of an action by any person, at any time within four years, for the joint use of himself and the educational fund of the county."

185.    Upon information and belief, thousands of individuals within Georgia have lost—and continue to lose—money through gambling contracts with Kalshi in the past four years.

186.    Kalshi is a gambling "winner" within the meaning of O.C.G.A. § 13-8-3.

187.    Plaintiffs and the Class have a right to recover from Kalshi the monies deposited as part of Kalshi's unlawful betting and/or wagering enterprise.

### ILLINOIS COUNT I
### CLAIM UNDER 720 ILCS 5/28-8
### (on behalf of Plaintiffs Samuel Gordon, Tyrone Davis, and the Illinois Class).
### Plaintiffs Against All Defendants

188.    Plaintiffs bring this count against all Defendants under 720 ILCS 5/28-8.

189.    720 ILCS 5/28-8(a) states, "Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof, with costs, in the circuit court. No person who accepts from another person for transmission, and transmits, either in his own name or in the name of such other person, any order for any transaction to be made upon, or who executes any order given to him by another person, or who executes any transaction for his own account on, any regular board of trade or commercial, commodity or stock exchange, shall, under any circumstances, be deemed a "winner" of any moneys lost by such other person in or through any such transactions."

190.    720 ILCS 5/28-8(b) states, "If within 6 months, such person who under the terms of Subsection 28-8(a) is entitled to initiate action to recover his losses does not in fact pursue his remedy, any person may initiate a civil action against the winner. The court or the jury, as the case may be, shall determine the amount of the loss. After such determination, the court shall enter a judgment of triple the amount so determined."

191.    Upon information and belief, thousands of individuals within Illinois have lost—and continue to lose—more than $50 through gambling contracts with Kalshi in the past four years.

192.    Kalshi is a gambling "winner" within the meaning of 720 ILCS 5/28-8.

193.    Each Plaintiff qualifies as a "[p]erson" authorized to sue for the recovery of losses at gaming within the meaning of 720 ILCS 5/28-8.

194.    Plaintiffs and the Class have a right to recover from Kalshi the monies deposited as part of Kalshi's unlawful betting and/or wagering enterprise.

**<u>MICHIGAN COUNT I</u>**
**CLAIM UNDER MCL 600.2939**
**(on behalf of Plaintiff Jackson Millikin and the Michigan Class).**
**Plaintiffs Against All Defendants**

195.    Plaintiffs bring this count against all Defendants under MCL 600.2939.

196.    MCL 600.2939(1) states, "In any suit brought by the person losing any money or goods, against the person receiving the same, when it appears from the complaint that the money or goods came to the hands of the defendant by gaming, if the plaintiff makes oath before the court in which such suit is pending, that the money or goods were lost by gaming with the defendant as alleged in the complaint, judgment shall be rendered that the plaintiff recovered damages to the amount of the said money or goods."

197.    Upon information and belief, thousands of individuals within Michigan have lost—and continue to lose—money through gambling at the hands of Kalshi.

198.    Kalshi is a gambling "winner" within the meaning of MCL 600.2939.

199.    Each Plaintiff qualifies as a "[p]erson" authorized to sue for the recovery of losses at gaming within the meaning of MCL 600.2939.

-56-

200.     Plaintiffs and the Class have a right to recover from Kalshi the monies deposited as part of Kalshi's unlawful betting and/or wagering enterprise.

**MINNESOTA COUNT I**
**CLAIM UNDER MINN. STAT. § 541.20**
**(on behalf of Plaintiff Simon Rachie and the Minnesota Class).**
**Plaintiffs Against All Defendants**

201.     Plaintiffs bring this count against all Defendants under Minn. Stat. § 541.20.

202.     Minn. Stat. § 541.20 states, "Every person who, by playing at cards, dice, or other game, or by betting on the hands or sides of such as are gambling, shall lose to any person so playing or betting any sum of money or any goods, and pays or delivers the same, or any part thereof, to the winner, may sue for and recover such money by a civil action, before any court of competent jurisdiction. For purposes of this section, gambling shall not include pari-mutuel wagering conducted under a license issued pursuant to chapter 240, purchase or sale of tickets in the state lottery, or gambling authorized under chapters 349 and 349A."

203.     Upon information and belief, thousands of individuals within Minnesota have lost—and continue to lose—money through gambling at the hands of Kalshi.

204.     Kalshi is a gambling "winner" within the meaning of Minn. Stat. § 541.20.

205.     Each Plaintiff qualifies as a "[p]erson" authorized to sue for the recovery of losses at gaming within the meaning of Minn. Stat. § 541.20.

206.     Plaintiffs and the Class have a right to recover from Kalshi the monies deposited as part of Kalshi's unlawful betting and/or wagering enterprise.

**OREGON COUNT I**
**CLAIM UNDER ORS § 30.740**
**(on behalf of Plaintiff Tyler Koessler and the Oregon Class).**
**Plaintiffs Against All Defendants**

207.     Plaintiffs bring this count against all Defendants under ORS § 30.740.

-57-

208.    ORS § 30.740 states, "All persons losing money or anything of value at or on any unlawful game … shall have a cause of action to recover from the dealer winning the same, or proprietor for whose benefit such game was played or dealt, or such money or thing of value won, twice the amount of the money or double the value of the thing so lost."

209.    Under ORS § 167.117 Kalshi offers unlawful games as a bookmaker, which is defined as, "a person who unlawfully accepts a bet from a member of the public upon the outcome of a future contingent event and who charges or accepts a percentage, fee or vigorish on the wager."

210.    Upon information and belief, thousands of individuals within Oregon have lost— and continue to lose—money through wagers on future contingent events through Kalshi.

211.    Kalshi is a gambling "proprietor" who benefited from Plaintiffs' wagers.

212.    Each Plaintiff qualifies as a "[p]erson" authorized to sue for the recovery of losses at gaming within the meaning of ORS § 30.740.

213.    Plaintiffs and the Class have a right to recover from Kalshi double the monies deposited as part of Kalshi's unlawful betting and/or wagering enterprise.

**<u>VIRGINIA COUNT I</u>**
**CLAIM UNDER VA. CODE ANN. § 11-15**
**(on behalf of Plaintiff Timothy Smith and the Virginia Class).**
**Plaintiffs Against All Defendants**

214.    Plaintiffs bring this count against all Defendants under Va. Code Ann. § 11-15.

215.    Va. Code Ann. § 11-15 states, "Any person who shall, by playing at any game or betting on the sides or hands of such as play at any game, lose within twenty-four hours, the sum or value of five dollars, or more, and pay or deliver the same, or any part thereof, may, within three months next following, recover from the winner, the money or the value of the goods so

-58-

lost and paid or delivered, with costs of suit in civil action, either by suit or warrant, according to the amount or value thereof."

216.    Upon information and belief, thousands of individuals within Virginia have lost—and continue to lose—more than five dollars through gambling on Kalshi in the past three months.

217.    Kalshi is a gambling "winner" within the meaning of Va. Code Ann. § 11-15.

218.    Each Plaintiff qualifies as a "[p]erson" authorized to sue for the recovery of losses at gaming within the meaning of Va. Code Ann. § 11-15.

219.    Plaintiffs and the Class have a right to recover from Kalshi the monies deposited as part of Kalshi's unlawful betting and/or wagering enterprise.

## PRAYER FOR RELIEF

220.    Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter an Order:

a.    Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as representatives of the Class, and appointing their counsel as class counsel;

b.    Declaring that Defendant's conduct, as set out above, violates sections 5-419 and -421 of the New York General Obligations Law and section 349 of the New York General Business Law;

c.    Entering judgment against Defendant, in the amount of the losses suffered by Plaintiffs and each member of the Class;

d.    Enjoining Defendant from continuing the challenged conduct;

e.    Awarding damages to Plaintiffs and the Class members in an amount to be determined at trial, including trebling as appropriate;

  f.  Awarding restitution to Plaintiffs and Class members in an amount to be determined at trial, and requiring disgorgement of all benefits that Defendant unjustly received;

  g.  Awarding reasonable attorney's fees and expenses; Awarding pre- and post-judgment interest, to the extent allowable;

  h.  Entering judgment for injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Class; and

  i.  Awarding such other and further relief as equity and justice require.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated:  December 23, 2025  Respectfully submitted,

By: _/s/ David Stellings_
  David Stellings
  Wilson M. Dunlavey
  Jacob S. Miller
  **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
  250 Hudson Street, 8th Floor
  New York, NY 10013-1413
  Telephone: 212.355.9500
  Facsimile: 212.355.9592
  dstellings@lchb.com
  wdunlavey@lchb.com
  jmiller@lchb.com